**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN PINKNEY, derivatively on behalf of QUIDELORTHO CORPORATION f/k/a QUIDEL CORPORATION, | |
| Plaintiff, | Case No. 1:24-cv-4753 |
| vs. | **JURY TRIAL DEMANDED** |
| DOUGLAS BRYANT, JOSEPH BUSKY, RANDALL STEWARD, KENNETH F. BUECHLER, EVELYN S. DILSAVER, EDWARD L. MICHAEL, MARY LAKE POLAN, JIM R. PRUTOW, ANN D. RHOADS, ROBERT R. SCHMIDT, CHRISTOPHER M. SMITH, MATTHEW W. STROBECK, KENNETH J. WIDDER, JOSEPH D. WILKINS JR., and STEPHEN H. WISE, | |
| Defendants, | |
| and | |
| QUIDELORTHO CORPORATION f/k/a QUIDEL CORPORATION, | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Steven Pinkney ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant QuidelOrtho Corporation f/k/a Quidel Corporation ("QOrtho" or the "Company"), files this Verified Shareholder Derivative Complaint against Douglas Bryant ("Bryant"), Joseph Busky ("Busky"), Randall Steward ("Steward") Kenneth F. Buechler, Ph.D. ("Buechler"), Evelyn S. Dilsaver ("Dilsaver"), Edward L. Michael ("Michael"),

Mary Lake Polan, M.D. ("Polan"), Jim R. Prutow ("Prutow"), Ann D. Rhoads ("Rhoads"), Robert R. Schmidt ("Schmidt"), Christopher M. Smith ("Smith"), Matthew W. Strobeck, Ph.D., ("Strobeck"), Kenneth J. Widder, M.D. ("Widder"), Joseph D. Wilkins Jr. ("Wilkins"), and Stephen H. Wise ("Wise") (collectively, the "Individual Defendants," and together with QOrtho, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of QOrtho, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, violations of Sections 14(a), 20(a) and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendant Bryant, Defendant Busky, and Defendant Steward for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding QOrtho, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by QOrtho's directors and officers from February 18, 2022 through April 1, 2024, both dates inclusive (the "Relevant Period").

2.      Founded in 1979, Quidel Corporation ("Quidel") was originally incorporated in California as "Monoclonal Antibodies Inc." In 1987, Quidel reincorporated in Delaware under

the name "Quidel Corporation." Quidel focuses on designing, identifying, and diagnosing medical conditions through rapid diagnostic testing solutions, with a special focus on respiratory illnesses. The Company's products were divided into four categories: (1) rapid immunoassay; (2) cardiometabolic immunoassay; (3) molecular diagnostic solutions; and (4) specialized diagnostic solutions. Quidel marketed its products through a network of distributors and a direct sales force. Quidel operated in one business segment that developed, manufactured and marketed its products internationally.

3.    Quidel sold products directly to end users and distributors for individual, non-professional over the counter ("OTC") use as well as for professional use in physician offices, hospitals, clinical laboratories, reference laboratories, urgent care clinics, universities, retail clinics, pharmacies and wellness screening centers.

4.    Before the COVID-19 pandemic, Quidel's business largely sold seasonal flu tests. However, once the pandemic emerged, Quidel extended its product offerings to COVID-19 detection tests. Since then, Quidel's revenue primarily came from selling COVID-19 tests to government organizations, well-known pharmacy chains, and healthcare providers through authorized distributors.

5.    Ortho Clinical Diagnostics Holding plc ("Ortho") originated as a public limited company organized under the laws of England and Wales. On December 1, 2021, Ortho held an initial public offering ("IPO") and began to sell its shares on the Nasdaq Global Market ("NASDAQ") under the symbol "OCDX."

6.    Ortho was a leading global provider of in-vitro diagnostics ("IVD") solutions to the clinical laboratory and transfusion medicine communities. Ortho's business model revolved

around the global distribution of IVDs, instruments, assays, reagents and other consumables to clinical laboratories, blood banks and hospitals.

7. Ortho maintained a massive distribution network that spanned more than 130 countries and territories, with a direct presence in 36 countries. Ortho's instruments, assays, reagents and other consumables were used in hospitals, laboratories, clinics, blood banks and donor centers worldwide. Ortho was globally operated with manufacturing facilities in the United States and the United Kingdom and with sales centers, administrative offices and warehouses internationally.

8. Just before the Relevant Period, in December 2021, Quidel announced that Quidel and Ortho would combine through a merger worth approximately $6 billion.[1]

9. On April 11, 2022, Quidel and Ortho filed a joint proxy statement/prospectus on Schedule 14A with the SEC (the "Merger Proxy Statement"). Defendants Bryant, Buechler, Michael, Polan, Rhoads, Strobeck, Widder, Wilkins, Schmidt, Smith, and Wise solicited shareholder approval of eight proposals in the Merger Proxy Statement, including, *inter alia*,: (1) the Merger; (2) the election of Bryant, Buechler, Michael, Polan, Rhoads, Strobeck, Widder, Wilkins, Schmidt, Smith, and Wise as directors; and (3) an amendment to increase the number of shares available under the Quidel's 2018 Equity Incentive Plan (the "Incentive Plan") by 1,500,000 (the "Incentive Plan Proposal").

---

[1] The Company is the result of a business combination that closed on May 27, 2022 (the "Merger") between Quidel and OrthoClinical. "QOrtho" refers to the Company after the May 2022 Merger and name change, whereas "Quidel" refers to the Company prior to the Merger and name change. "Ortho" refers to OrthoClinical prior to the consummation of the Merger.

10.     Quidel shareholders approved the Merger, along with the other proposals, including the amendment to increase the number of shares available under the Incentive Plan by 1,500,000, on May 16, 2022.

11.     By the time the Merger closed on May 27, 2022, COVID-19 was already endemic in the United States. However, before, during, and after the Merger, the Individual Defendants represented that, despite COVID-19 becoming endemic, QOrtho remained poised to maintain revenue figures from selling COVID-19 tests and other products relating to the Company's respiratory business.

12.     Additionally, the Individual Defendants represented that QOrtho planned to launch a new test called the Savanna Respiratory Viral Panel-4 (the "Savanna") as its "new flagship product" through Ortho's robust distribution network. During the Relevant Period, the Savanna was not approved by the U.S. Food and Drug Administration (the "FDA") to be sold or marketed in the United States ("U.S.").

13.     During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) QOrtho oversold COVID-19 tests to pharmacy chains and distributors in excess of what the clients could resell to end customers and healthcare providers; (2) as a result, the supply chain was saturated because pharmacy chains and distributors held excess inventory of COVID-19 tests; (3) as a further result, distributors and pharmacy chains significantly lowered their COVID-19 test orders from QOrtho; (4) undisclosed

issues with the Savanna would delay the Savanna's entry into the U.S. market; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the amendment increasing the number of shares available under the Incentive Plan; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

14.    The truth began to emerge on February 13, 2024 when QOrtho issued a press release that revealed disappointing financial results for the fourth quarter and fiscal year ended December 31, 2023 ("Fiscal Year 2023"). For instance, the press release reported that the Company's Adjusted Earnings Per Share ("AEPS") was 46% below the average of analysts' expectations. QuidelOrtho blamed the poor AEPS performance on lower sales of COVID-19 tests from pharmacy chain customers and distributors during the quarter. The press release further revealed that QOrtho chopped its financial outlook for the 2024 fiscal year, including halving the Company's annual endemic COVID-19 revenue projections, from $200-$400 million to just $200 million.

15.    However, on an earnings conference call held that same day, Defendant Bryant continued to make false and misleading statements about the potential for the FDA to approve Savanna for sale in the U.S. Specifically, Defendant Bryant represented that "the status of the submission of the 510(k) is on track per my previous comments. Recall that I had said that we expect to get clearance before the end of the first quarter, I think we're still on track for all that."

16.    The market reacted violently to the disappointing projections and financial results. Alexander Nowak, an analyst for Craig-Hallum, downgraded his QuidelOrtho stock rating from "Buy" to "Hold," writing that "Q4 came in as one of the most surprising results we have seen in

diagnostics in some time." Andrew Cooper, an analyst from Raymond James, downgraded his QuidelOrtho stock rating as well, expressing disgust with the Individual Defendants "fairly deplorable communication and expectation setting both over the course of 2023 and even as recently as [January 2024]."

17.    On this news, the price of QOrtho stock fell $21.50, or approximately 32%, from a closing price of $66.77 per share on February 13, 2024 to close at $45.27 per share on February 14, 2024.

18.    Approximately one week later, on February 21, 2024, the truth continued to emerge when QOrtho's Board fired Defendant Bryant from his positions of President and Chief Executive Officer ("CEO"), positions he had held at the Company and at Quidel since December 2022 and March 2009, respectively. Relegated to his directorship on the Board, he resigned from the Board the same day his firing was announced, also on February 21, 2024.

19.    On April 2, 2024, the truth fully emerged when the Company revealed that it had withdrawn the 510(k) submission that sought FDA approval of Savanna in the U.S due to data on the new product not meeting expectations. Patrick Donnelly, a Citi analyst, stated that the Savanna was "expected to be a key driver of Savanna uptake in the respiratory season."

20.    On this news, the price of QOrtho stock fell $4.85, or approximately 10%, from a closing price of $47.00 on April 1, 2024, to close at $42.15 on April 2, 2024.

21.    During the Relevant Period, the Individual Defendants also breached their fiduciary duties by causing QOrtho to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations and material omissions. Between February 2022 and April 2024, approximately 1,300,722 shares of QOrtho's common stock were repurchased, costing the Company over $132.6 million. As the Company's stock was actually only worth

$42.25 per share, the price at which it was trading when markets closed on April 1, 2024, the Company overpaid for repurchases of its own stock by ***over $77.7 million***[2] in total.

22.     In further breach of their fiduciary duties, Defendants Buechler engaged in lucrative insider trading while the Company's stock price was artificially inflated due to the Individual Defendants' false and misleading statements, reaping collective personal profits exceeding $902,616.

23.     Additionally, in further breach of their fiduciary duties, the Individual Defendants, during the Relevant Period, caused the Company to fail to maintain adequate internal controls.

24.     In light of the Individual Defendants' misconduct—which has negatively impacted the value of the Company and subjected the Company, its former CEO, its Chief Financial Officer ("CFO") and former CFO to a federal securities class action lawsuit currently pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

25.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

26.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in

---

[2] Unless otherwise noted, all emphasis is added.

this derivative action and of Defendants Bryant, Busky, and Steward's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

27.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), SEC Rule 10b-5 17 C.F.R. § 240.10b-5 promulgated thereunder, Section 20(a) of the Exchange Act, §§ 78t(a) and 78t-1, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

28.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

29.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

30.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Company conducts business in the District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that have had an effect in this District.

## PARTIES

**Plaintiff**

31.    Plaintiff is a current shareholder of QOrtho. Plaintiff has continuously held QOrtho common stock since December 3, 2021.

**Nominal Defendant QOrtho**

32.    Nominal Defendant QOrtho is a Delaware corporation with its principal executive offices located at 9975 Summers Ridge Road, San Diego, California 92121. QOrtho shares trade on NASDAQ under the ticker symbol "QDEL."

**Defendant Bryant**

33.    Defendant Bryant served as a director of the Company from 2009 until he resigned on February 21, 2024. He also served as the Company's President from December 2022 and as CEO from March 2009 until his termination from both positions on February 21, 2024. According to the proxy statement the Company filed with the SEC on April 2, 2024 (the "2024 Proxy Statement"), as of March 18, 2024, Defendant Bryant beneficially owned 774,513 shares of the Company common stock, or 1.2% of the total outstanding stock of the Company. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $49.00, Defendant Bryant owned approximately $37.9 million worth of QOrtho common stock as of that date.

34.    For the fiscal year ending December 31, 2022 ("Fiscal Year 2022"), Defendant Bryant received $13,088,091 in total compensation from the Company. This included $1,010,625 in salary, $1,054,875 in bonuses, $6,665,163 in stock awards, $1,404,343 in option awards, $1,845,641 in non-equity incentive plan compensation, and $904,957 in all other compensation.

35.    For Fiscal Year 2023, Defendant Bryant received $6,757,143 in total compensation from the Company.  This included $1,060,875 in salary, $556,959 in bonuses,

$3,447,814 in stock awards, $1,483,947 in option awards, and $207,548 in all other compensation.

36.     The 2023 Proxy Statement stated the following about Defendant Bryant:

Mr. Bryant has served as our Chief Executive Officer ("CEO") since March 2009 and as our President since December 2022 and from March 2009 to May 2022. He previously served as the Chair of our Board from May 2022 to December 2022. Prior to joining us, Mr. Bryant served as Executive Vice President and Chief Operating Officer at Luminex Corporation, managing its Bioscience Group, Luminex Molecular Diagnostics (Toronto), manufacturing, R&D, technical operations and commercial operations. From 1983 to 2007, Mr. Bryant held various worldwide commercial operations positions with Abbott Laboratories including, among others: Vice President of Abbott Vascular for Asia/Japan, Vice President of Abbott Molecular Global Commercial Operations and Vice President of Abbott Diagnostics Global Commercial Operations. Earlier in his career with Abbott, Mr. Bryant was Vice President of Diagnostic Operations in Europe, the Middle East and Africa and Vice President of Diagnostic Operations Asia Pacific. Mr. Bryant holds a B.A. in Economics from the University of California at Davis.

**Defendant Busky**

37.     Defendant Busky has served as the Company's Chief Financial Officer ("CFO") since May 27, 2022.  According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Busky beneficially owned 61,642 shares of the Company common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $49.00, Defendant Busky owned approximately $3 million worth of QOrtho common stock as of that date.

38.     For Fiscal Year 2022, Defendant Busky received $3,255,396 in total compensation from the Company. This included $316,712 in salary, $538,125 in bonuses, $1,499,997 in stock awards, $499,416 in option awards, $380,571 in non-equity incentive plan compensation, and $20,595 in all other compensation.

39.    For Fiscal Year 2023, Defendant Busky received $2,943,018 in total compensation from the Company. This included $569,250 in salary, $230,625 in bonuses, $1,292,222 in stock awards, $760,170 in option awards, and $90,751 in all other compensation.

40.    QOrtho's website's "Company Leadership" page[3], last accessed on June 12, 2024, stated the following about Defendant Busky:

> Joseph Busky, Chief Financial Officer of QuidelOrtho Corporation, manages global finance and drives value creation to enable growth and long-term value.
>
> Mr. Busky has more than 30 years of experience in corporate and operational finance for large, global companies across diagnostics, medical devices, telecom, and marketing services. He has worked both for publicly owned companies and within private equity-owned settings.
>
> Prior to joining Ortho Clinical Diagnostics in July 2020, Mr. Busky served as Chief Financial Officer for Vyaire Medical, Inc., a global medical device company. Before Vyaire, Mr. Busky was Chief Financial Officer of FDH Velocitel, an engineering services company in the telecom space. Previously, he served seven years as Chief Financial Officer of InnerWorkings, Inc., a global marketing services firm with operations in 33 countries, and held corporate and divisional finance roles for a combined 11 years at Siemens Medical Solutions Diagnostics/Dade Behring Holdings, Inc., Bayer Diagnostics and Diagnostic Products Corporation, including serving as Chief Accounting Officer at Dade Behring.
>
> Mr. Busky holds an MBA with a finance concentration, as well as a BBA in Accounting, from Loyola University in Baltimore. He also has a CPA certification in Maryland.

**Defendant Steward**

41.    Defendant Steward served as the Company's CFO from October 2011 until he retired on May 27, 2022.

42.    For Fiscal Year 2022, Defendant Steward received $3,157,747 in total compensation from the Company. This included $385,193 in salary, $586,971 in bonuses,

---

[3] https://www.quidelortho.com/za/en/our-company/leadership/joseph-busky

$1,499,960 in stock awards, $262,264 in non-equity incentive plan compensation, and $423,359 in all other compensation.

43.    The annual report filed on Form 10-K with the SEC for the fiscal year ending December 31, 2018 ("2018 10-K") stated the following about Defendant Steward:

> Randall J. Steward, 63, became our Chief Financial Officer in October 2011. Prior to joining us, Mr. Steward served as the Chief Financial Officer for Navilyst Medical, Inc., a medical device company based in Massachusetts. From 2008 to January 2011, Mr. Steward served as Chief Operating Officer for SeQual Technologies, Inc., a San Diego-based medical device company, where he was responsible for all aspects of engineering, manufacturing, finance, and information systems. Prior to SeQual Technologies, Mr. Steward spent 11 years with Spectrum Brands as Executive Vice President and Chief Financial Officer. Mr. Steward holds a B.B.A. in Accounting from Southern Methodist University. He is also a Certified Public Accountant and a member of the American Institute of Certified Public Accountants.

**Defendant Buechler**

44.    Defendant Buechler has served as Chairman of the Board since December 2022 and has served as a Company director since 2007. He also serves as a member of the Nominating and Corporate Governance Committee and serves as Chair of the Science and Technology Committee. Previously, he served as Lead Independent Director from May 2022 until December 2022. According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Buechler beneficially owned 115,720 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $49.00, Defendant Buechler owned approximately $5.7 million worth of QOrtho common stock as of that date.

45.    For Fiscal Year 2022, Defendant Buechler received $379,620 in total compensation from the Company. This included $123,264 in fees earned or paid in cash and $256,356 in stock awards.

46.    For Fiscal Year 2023, Defendant Buechler received $411,497 in total compensation from the Company. This included $155,000 in fees earned or paid in cash and $256,497 in stock awards.

47.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Buechler made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 17, 2023 | 8,081 | $90.26 | $729,391 |

Thus, in total, before the fraud was exposed, Defendant Buechler sold 8,081 shares of Company common stock on inside information, for which he received approximately $729,391 in proceeds. Buechler's insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

48.    The 2024 Proxy Statement stated the following about Defendant Buechler:

Dr. Buechler has served as the Chair of the Board since December 2022, and from August 2015 to May 2022, and he previously served as the Lead Independent Director from May 2022 to December 2022. Dr. Buechler was previously the co-founder of and held various roles at Biosite Inc. from 1988 until its acquisition by Alere Inc. in 2007, including serving as a director and as President and Chief Scientific Officer, Senior Vice President, Research and Development, and Vice President, Research and Director of Chemistry. Prior to co-founding Biosite, Dr. Buechler was a senior research scientist for the diagnostics research and development group at Hybritech Inc. Dr. Buechler currently serves as a director of TriVirum, Inc., and previously served as chair of the board of directors of Sequenom Inc., a life sciences company until its acquisition in September 2016, Astute Medical Inc., a company that develops biomarkers for acute medical conditions, until its acquisition in April 2018 and Edico Genome Inc., a DNA sequencing technology company until its acquisition in May 2018. Dr. Buechler received his Ph.D. in Biochemistry and his Bachelor's Degree in Chemistry from Indiana University.

**Defendant Dilsaver**

49.     Defendant Dilsaver has served as a director of the Company since 2021. She also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Dilsaver beneficially owned 3,199 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $49.00, Defendant Dilsaver owned approximately $156,751 worth of QOrtho common stock as of that date.

50.     For Fiscal Year 2022, Defendant Dilsaver received $249,831 in total compensation from the Company. This included $39,890 in fees earned or paid in cash and $209,941 in stock awards.

51.     For Fiscal Year 2023, Defendant Dilsaver received $286,953 in total compensation from the Company. This included $70,000 in fees earned or paid in cash and $216,953 in stock awards.

52.     The 2024 Proxy Statement stated the following about Defendant Dilsaver:

Ms. Dilsaver previously served as President and Chief Executive Officer of Charles Schwab Investment Management, the mutual fund arm of The Charles Schwab Corporation from 2004 to 2007. Prior to that, Ms. Dilsaver served in various leadership roles at The Charles Schwab Corporation for more than 16 years beginning in 1991, including as Executive Vice President and Senior Vice President, Asset Management Products and Services of Charles Schwab Investment Management. Ms. Dilsaver also serves as a director of Ballard Private Real Estate Fund, a private company, and as an advisory board member at Protivi Inc. Ms. Dilsaver received her B.A. in Accounting from California State University-Hayward, School of Business and Economics and participated in the Stanford Graduate School of Business, Senior Executive Program.

**Defendant Michael**

53.     Defendant Michael has served as a director of the Company since 2018. He also serves as the Chair of the Compensation Committee and as a member of the Science and Technology Committee. According to the 2024 Proxy Statement, as of March 18, 2024,

Defendant Michael beneficially owned 16,756 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $49.00, Defendant Michael owned approximately $821,044 worth of QOrtho common stock as of that date.

54.     For Fiscal Year 2022, Defendant Michael received $312,793 in total compensation from the Company. This included $75,863 in fees earned or paid in cash and $236,930 in stock awards.

55.     For Fiscal Year 2023, Defendant Michael received $326,942 in total compensation from the Company. This included $ 90,000 in fees earned or paid in cash and $236,942 in stock awards.

56.     The 2024 Proxy Statement stated the following about Defendant Michael:

Mr. Michael is the Managing Partner of LionBird Ventures, a venture capital firm he co-founded in 2012, which focuses on investing in digital health and business services companies. For nearly 27 years, Mr. Michael held a variety of roles at Abbott Laboratories, including most recently as Executive Vice President, Diagnostic Products and previously in legal, commercial and operational roles in various Abbott divisions. Mr. Michael currently serves on the board of directors of certain private LionBird portfolio companies. Mr. Michael received his B.A. from Indiana University and a J.D. from Indiana University School of Law.

**Defendant Polan**

57.     Defendant Polan has served as a director of the Company since 1993. She also serves as a member of both the Compensation Committee and the Science and Technology Committee. According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Polan beneficially owned 27,990 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $49.00, Defendant Polan owned approximately $1.4 million worth of QOrtho common stock as of that date.

58.     For Fiscal Year 2022, Defendant Polan received $289,655 in total compensation from the Company. This included $58,795 in fees earned or paid in cash and $230,860 in stock awards.

59.     For Fiscal Year 2023, Defendant Polan received $300,945 in total compensation from the Company. This included $70,000 in fees earned or paid in cash and $230,945 in stock awards.

60.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Polan made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 18, 2022 | 1,525 | $113.59 | $173,225 |

Thus, in total, before the fraud was exposed, Defendant Polan sold 1,525 shares of Company common stock on inside information, for which she received approximately $173,225 in proceeds. Polan's insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

61.     The 2024 Proxy Statement stated the following about Defendant Polan:

Dr. Polan served as an Adjunct Professor in the Department of Obstetrics and Gynecology at Columbia University School of Medicine from 2007 to 2014 and then in 2015, she rejoined the Department of Obstetrics and Gynecology at Yale University School of Medicine as a Professor of Clinical Obstetrics, Gynecology and Reproductive Sciences. Dr. Polan previously served as a Professor and Chair Emerita of the Department of Gynecology and Obstetrics at Stanford University School of Medicine from 1990 to 2005, and before that served on the faculty at Yale University. Dr. Polan received a B.A. degree from Connecticut College, a Ph.D. in Molecular Biophysics and Biochemistry and an M.D. from Yale University School of Medicine and her M.P.H. from the University of California, Berkeley. Dr. Polan remained at Yale New Haven Hospital for her residency in Obstetrics and Gynecology, followed by a Reproductive Endocrine Fellowship.

Dr. Polan also serves as a director at the following private companies: NX Prenatal Inc., Or-Genix Therapeutics, Inc., Residents Diagnostics, Inc. and MiraDx, Inc.

**Defendant Prutow**

62.     Defendant Prutow has served as a director of the Company since November 28, 2023. He also serves as a member of the Nominating and Corporate Governance Committee and as a member of the Science and Technology Committee. Since 2022, Defendant Prutow has served as Operating Executive at The Carlyle Group, a global private equity firm that, according to the 2024 Proxy Statement, owned 12,460,183 shares of the Company's common stock, or 18.6% of the total outstanding shares of the Company as of March 18, 2024. Pursuant to the Merger, The Carlyle Group ("Carlyle") may designate two directors to the Board of the Company. The two directors currently on the Board who are Carlyle designees are Defendant Schmidt and Defendant Prutow.

63.     For Fiscal Year 2023, Defendant Prutow received $110,833 in total compensation from the Company. This included $5,833 in fees earned or paid in cash and $105,000 in stock awards.

64.     The 2024 Proxy Statement stated the following about Defendant Prutow:

Mr. Prutow has served as Co-Founder of Atmas Health, a healthcare investment partnership, since 2022 and as Operating Executive at The Carlyle Group, a global investment firm, focused on the healthcare sector since 2022. Mr. Prutow has over 30 years of healthcare experience as both an executive and consultant across many medtech, life sciences and diagnostics companies. Prior to joining Carlyle, Mr. Prutow most recently served as a Senior Healthcare PE Partner at PricewaterhouseCoopers LLP, an audit, assurance, consulting and tax services firm, and PRTM, a management consulting subsidiary of PwC, from 2005 to 2022, where he collaborated with Carlyle and other private equity sponsors on hundreds of diligences across the globe as well as supported portfolio company management teams on value creation initiatives. Before PwC, Mr. Prutow worked at a range of leading healthcare companies, including Baxter, Dade Behring, Nanogen and GeneLogic. Mr. Prutow currently serves on the board of directors of the Carlyle portfolio company, Corro Health, since 2022 and The Marfan Foundation since 2019. Mr. Prutow earned his B.S. in both Genetics and Economics from the

University of California, Davis, his M.B.A. from the Golden Gate University and his J.D. from the University of San Diego School of Law.

**Defendant Rhoads**

65.    Defendant Rhoads has served as a director of the Company since 2020. She also serves as the Chair of the Audit Committee. According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Rhoads beneficially owned 6,817 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $49.00, Defendant Rhoads owned approximately $334,033 worth of QOrtho common stock as of that date.

66.    For Fiscal Year 2022, Defendant Rhoads received $301,940 in total compensation from the Company. This included $73,041 in fees earned or paid in cash and $228,899 in stock awards.

67.    For Fiscal Year 2023, Defendant Rhoads received $314,473 in total compensation from the Company. This included $95,000 in fees earned or paid in cash and $219,473 in stock awards.

68.    The 2024 Proxy Statement stated the following about Defendant Rhoads:

Ms. Rhoads most recently served as Chief Financial Officer of Forty Seven, Inc., a publicly-traded biotechnology company, from March 2018 to June 2020. Previously, Ms. Rhoads was the Executive Vice President and Chief Financial Officer of Zogenix, Inc., a publicly-traded pharmaceutical company, from 2010 to January 2017. From 2000 to the end of 2009, Ms. Rhoads served as the Chief Financial Officer of Premier, Inc., a healthcare supply management company. From 1998 to 2000, she was the Vice President, Strategic Initiatives at Premier, Inc., and from 1993 to 1998, she was an investment professional with The Sprout Group, an institutional venture capital firm. Ms. Rhoads holds a B.S. in Finance from the University of Arkansas and an M.B.A. from the Harvard Graduate School of Business Administration.

**Defendant Schmidt**

69.     Defendant Schmidt has served as a director of the Company since 2022. He also serves as a member of the Compensation Committee. Defendant Schmidt is Managing Director at Carlyle, a global private equity firm that, according to the 2024 Proxy Statement, owned 12,460,183 shares of the Company's common stock, or 18.6% of the total outstanding shares of the Company as of March 18, 2024. Pursuant to the Merger, Carlyle may designate two directors to the Board of the Company. The two directors currently on the Board who are Carlyle designees are Defendant Schmidt and Defendant Prutow.

70.     For Fiscal Year 2022, Defendant Schmidt received $52,500 in total compensation from the Company, consisting entirely of $52,500 in fees earned or paid in cash.

71.     For Fiscal Year 2023, Defendant Schmidt received $70,000 in total compensation from the Company, consisting entirely of $70,000 in fees earned or paid in cash.[4]

72.     The 2024 Proxy Statement stated the following about Defendant Schmidt:

Mr. Schmidt serves as Managing Director at The Carlyle Group, a global investment firm, where he focuses on investment opportunities in the healthcare sector. Since joining The Carlyle Group in 2011, Mr. Schmidt has been involved in a number of the firm's investments globally. Prior to joining Carlyle, Mr. Schmidt worked at Welsh, Carson, Anderson & Stowe, a private equity firm focused on information business services and healthcare investments, and Merrill Lynch Global Private Equity, which is focused on buyouts in North America. Mr. Schmidt also serves on the board of directors of the following private companies: Included Health, Medline, MedRisk, Resonetics and Unchained Labs. Mr.

---

[4] According to the 2024 Proxy Statement, on May 27, 2022, the day following the Merger, Defendant Schmidt, the Company, and Carlyle "entered into an agreement (the "Carlyle Board Fees Agreement"), pursuant to which Mr. Schmidt agreed that the Carlyle Stockholder is the beneficiary recipient of the annual cash retainer relating to Mr. Schmidt's service on the Board for so long as Mr. Schmidt is an employee of the Carlyle Stockholder, and the Company agreed to pay the annual cash retainer to the Carlyle Stockholder. Accordingly, Mr. Schmidt does not receive an annual cash retainer for his service on the Board in his personal capacity due to his employment with the Carlyle Stockholder. Instead, the Carlyle Stockholder receives an annual remuneration of $70,000 for Mr. Schmidt's service on the Board. Although Mr. Prutow was also designated to the Board by the Carlyle Stockholder, he is not an employee of the Carlyle Stockholder and receives the annual cash retainer of $70,000 for his service on the Board in his personal capacity."

Schmidt received an M.B.A. from the Harvard Business School and a B.S. from The Wharton School at the University of Pennsylvania.

**Defendant Smith**

73.    Defendant Smith served as a director of the Company from May 27, 2022 until he resigned on August 31, 2023. From September 2019 until the Merger, Defendant Smith served as Ortho's CEO.

74.    For Fiscal Year 2022, Defendant Smith received $249,831 in total compensation from the Company. This included $39,890 in fees earned or paid in cash and $209,941 in stock awards.

75.    For Fiscal Year 2023, Defendant Smith received $35,000 in total compensation from the Company, consisting entirely of $35,000 in fees earned or paid in cash.

76.    The 2023 Proxy Statement stated the following about Defendant Smith:

Mr. Smith has served as the Chief Executive Officer of Neogenomics, Inc., an oncology testing lab and service provider, since August 2022. From September 2019 to May 2022, Mr. Smith served as Ortho's Chief Executive Officer. Mr. Smith also served as the Chief Executive Officer of Cochlear Limited, a medical device company, from 2015 to 2018. Prior to joining Cochlear Limited, he held senior executive roles at Gyrus Group Plc., KCI, Prism and Cardinal Health. Mr. Smith currently serves on the board of directors of Osler Diagnostics, a private company, as the board chair. Mr. Smith received a B.S. from Texas A&M University.

**Defendant Strobeck**

77.    Defendant Strobeck has served as a director of the Company since 2018. He also serves as a member of the Audit Committee and as a member of the Science and Technology Committee. According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Strobeck beneficially owned 65,462 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $49.00, Defendant Strobeck owned approximately $3.2 million worth of QOrtho common stock as of that date.

78.    For Fiscal Year 2022, Defendant Strobeck received $268,736 in total compensation from the Company. This included $58,795 in fees earned or paid in cash and $209,941 in stock awards.

79.    For Fiscal Year 2023, Defendant Strobeck received $280,000 in total compensation from the Company. This included $70,000 in fees earned or paid in cash and $210,000 in stock awards.

80.    The 2024 Proxy Statement stated the following about Defendant Strobeck:

Dr. Strobeck has served as the Managing Partner of Birchview Capital, a hedge fund, since 2014. Dr. Strobeck was a Partner and member of the management committee and advisory board of Westfield Capital Management from 2008 to 2011, having served as a member of the investment team, specializing in healthcare and life sciences, from May 2003 to June 2008. Dr. Strobeck currently serves on the boards of directors of Monteris Medical, a privately-held medical device company, and the Schuler Education Foundation. Dr. Strobeck received his B.S. from St. Lawrence University, a Ph.D. from the University of Cincinnati, an S.M. from the Harvard University/MIT Health Sciences Technology Program, and an S.M. from the MIT Sloan School of Management.

**Defendant Widder**

81.    Defendant Widder has served as a director of the Company since 2014. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of both the Audit Committee and the Science and Technology Committee. According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Widder beneficially owned 48,415 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $49.00, Defendant Widder owned approximately $2.4 million worth of QOrtho common stock as of that date.

82.    For Fiscal Year 2022, Defendant Widder received $306,559 in total compensation from the Company. This included $71,123 in fees earned or paid in cash and $235,436 in stock awards.

83.    For Fiscal Year 2023, Defendant Widder received $320,465 in total compensation from the Company. This included $85,000 in fees earned or paid in cash and $235,465 in stock awards.

84.    The 2024 Proxy Statement stated the following about Defendant Widder:

Dr. Widder has more than 30 years of experience working with biomedical companies. Dr. Widder previously served as the Executive Chair of OrphoMed Inc., a clinical-stage biopharmaceutical company, from 2017 to 2022, and board chair and Chief Executive Officer of Sydnexis, Inc., an ophthalmology start-up company, from 2017 to 2022. Dr. Widder was a General Partner with LVP Life Science Ventures, a venture capital company for biotechnology and medical device start-ups, from 2007 to 2016. Dr. Widder holds an M.D. from Northwestern University and trained in pathology at Duke University.
**Defendant Wilkins**

85.    Defendant Wilkins has served as a director of the Company since 2021. He also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Wilkins beneficially owned 4,161 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $49.00, Defendant Wilkins owned approximately $203,889 worth of QOrtho common stock as of that date.

86.    For Fiscal Year 2022, Defendant Wilkins received $268,736 in total compensation from the Company. This included $58,795 in fees earned or paid in cash and $209,941 in stock awards.

87.    For Fiscal Year 2023, Defendant Wilkins received $280,000 in total compensation from the Company. This included $70,000 in fees earned or paid in cash and $210,000 in stock awards.

88.    The 2024 Proxy Statement stated the following about Defendant Wilkins:

Mr. Wilkins currently serves as senior advisor for THEO Transformation Advisory, an advisory group, as a trusted partner and advisor to chief executive officers, senior leaders and governing boards at the forefront of transforming health and well-being, and has served in this position since October 2022. Previously, Mr. Wilkins served as Senior Vice President and Chief Transformation and Innovation Officer for Atlantic Health System, an integrated healthcare delivery system, from October 2016 to October 2018. Prior to that, Mr. Wilkins led commercial operations teams at Quest Diagnostics and before that, he held various leadership roles at Danaher-Beckman Coulter for approximately 28 years. Mr. Wilkins also serves on the board of directors of Providence Health and Services, one of the nation's largest healthcare systems, and serves on the Tiger Woods, TGR Foundation. Mr. Wilkins earned a B.S. and an M.B.A. degree from Argosy University and is a board-certified fellow of the American College of Healthcare Executives.

### **Defendant Wise**

89.    Defendant Wise served as a director of the Company from May 27, 2022 until he resigned on November 27, 2023. He also served as a member of the Nominating and Corporate Governance Committee. Defendant Wise also serves as the Managing Director and Global Head of Healthcare at Carlyle, a global private equity firm that, according to the 2024 Proxy Statement, owned 12,460,183 shares of the Company's common stock, or 18.6% of the total outstanding shares of the Company as of March 18, 2024. Pursuant to the Merger, Carlyle may designate two directors to the Board of the Company. The two directors currently on the Board who are Carlyle designees are Defendant Schmidt and Defendant Prutow.

90.    For Fiscal Year 2022, Defendant Wise received $52,500 in total compensation from the Company, consisting entirely of $52,500 in fees earned or paid in cash.

91.    For Fiscal Year 2023, Defendant Wise received $58,334 in total compensation from the Company, consisting entirely of $58,334 in fees earned or paid in cash.

92.    The 2023 Proxy Statement stated the following about Defendant Wise:

Mr. Wise currently serves as a Managing Director and Global Head of Healthcare at The Carlyle Group, a private equity firm. Prior to joining Carlyle in 2006, Mr. Wise worked with JLL Partners, a New York-based private equity firm, where he focused on health care-related investments, J.W. Childs Associates, a Boston-

based private equity firm, and prior to that, in the leveraged finance group of Credit Suisse. Mr. Wise also serves on the board of directors of the following private companies: Atmas Health, Curia, Launch Therapeutics, Medicine Industries, LP, Millicent Pharma Limited, Resonetics and Sedgewick Inc. Mr. Wise also serves on the Leadership Council of the Harvard School of Public Health and the board of directors of the Massachusetts General Hospital Center for Global Health. Mr. Wise earned a bachelor's degree in economics and finance from Bucknell University and received his M.B.A. from Harvard Business School.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

93.    By reason of their positions as officers, directors, and/or fiduciaries of QOrtho, and because of their ability to control the business and corporate affairs of QOrtho, the Individual Defendants owed QOrtho and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage QOrtho in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of QOrtho and its shareholders so as to benefit all shareholders equally.

94.    Each director and officer of the Company owes to QOrtho and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

95.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of QOrtho, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

96.    To discharge their duties, the officers and directors of QOrtho were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

97.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good

faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of QOrtho, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

98.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

99.     To discharge their duties, the officers and directors of QOrtho were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of QOrtho were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and Code

of Business Conduct and Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how QOrtho conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of QOrtho and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that QOrtho operations would comply with all applicable laws and QOrtho financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and

accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

100.    Each of the Individual Defendants further owed to QOrtho and the shareholders the duty of loyalty requiring that each favor QOrtho interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

101.    At all times relevant hereto, the Individual Defendants were the agents of each other and of QOrtho and were at all times acting within the course and scope of such agency.

102.    Because of their advisory, executive, managerial, and directorial positions with QOrtho, each of the Individual Defendants had access to adverse, non-public information about the Company.

103.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by QOrtho.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

104.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

105.    The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial

condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

106.    The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of QOrtho was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

107.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

108.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of QOrtho, and was at all times acting within the course and scope of such agency.

### QOrtho's CODES OF CONDUCT AND CORPORATE GOVERNANCE

#### QOrtho's Code of Conduct

109.    The Company's Code of Conduct applies to all directors, officers employees, and temporary workers of QOrtho.

110.     Under   the   heading   "Accuracy   of   Financial   Reports   and   Other   Public Communications," the Code of Conduct provides the following:

> The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.
>
> If you have any unresolved concerns or complaints regarding questionable accounting or auditing matters, you are encouraged to submit those concerns or complaints through any one of the methods described below. Subject to applicable law and to the fullest extent possible, all such submissions will be treated confidentially.

111.     Under   the   heading   "Compliance   with   Laws   and   Regulations,"   the   Code   of Conduct provides:

> Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, the development, testing, approval, manufacture, marketing and sale of our products, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or the Company's Legal and Compliance Department.

112.     Under the heading "Compliance with Insider Trading Laws," the Code of Conduct provides:

> Consistent with the Company's Insider Trading Compliance Policy, the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company.  In addition, Company employees and directors are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell the Company's stock or other securities on the basis of material non-public information.  Employees and directors who obtain material non-public information about another company in the course of their duties are prohibited from trading in

the stock or securities of the other company while in possession of such information or "tipping" others to trade on the basis of such information. Violation of insider trading laws can result in severe fines and criminal penalties, as well as disciplinary action by the Company, up to and including termination of employment. You are required to read carefully and observe our Insider Trading Compliance Policy, as amended from time to time. Please contact the Company's Legal and Compliance Department for a copy of the Insider Trading Compliance Policy or with any questions you may have about insider trading laws.

113.    Under the heading "Public Communications and Regulation FD," the Code of

Conduct provides:

The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive information. The Company has adopted a separate Policy Regarding Communications with Analysts, Securityholders and Others (the "Regulation FD Policy") and an External Communications Policy to maintain the Company's credibility and reputation in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data. All requests for information or comments about the Company or its products from members of the media, analysts, and other third parties should be handled in accordance with the Company's policies and procedures regarding public communications, including the Regulation FD Policy and the External Communications Policy. Please contact the Company's Legal and Compliance Department for copies of the Regulation FD Policy and the External Communications Policy or with any questions you may have about disclosure matters.

*** 

In connection with its public communications, the Company is required to comply with a rule under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD provides that, when we disclose material non-public information about the Company to securities market professionals or shareholders (where it is reasonably foreseeable that the shareholders will trade on the information), we must also disclose the information to the public. "Securities market professionals" generally include analysts, institutional investors and other investment advisors. You are required to read carefully and comply with our Regulation FD Policy, as amended from time to

time. Please inform your supervisor or the Legal and Compliance Department if
you do not have a copy of our Regulation FD Policy.

114. Under the heading "Reporting Violations of this Code," the Code of Conduct

provides:

> All employees and directors have a duty to report any known or suspected
> violation of this Code, including violations of the laws, rules, regulations or
> policies that apply to the Company. If you suspect a violation of this Code, you
> should immediately report the conduct to an immediate supervisor, the Company's
> Legal and Compliance Department, or the QuidelOrtho Ethics Hotline. Upon
> receipt, the General Counsel, or his or her designee, will work with appropriate
> persons to investigate the concern.

115. Under the same heading "Reporting Violations of this Code," the Code of Conduct

provides:

> It is Company policy that any employee or director who violates this Code will be
> subject to appropriate discipline, which may include termination of employment
> (or removal from the Board of Directors), as appropriate. This determination will
> be based upon the facts and circumstances of each particular situation. If you are
> accused of violating this Code, you will be given an opportunity to present your
> version of the events at issue prior to any determination of appropriate discipline.
> Employees and directors who violate the law or this Code may expose themselves
> to substantial civil damages, criminal fines and prison terms. The Company may
> also face substantial fines and penalties and may incur damage to its reputation
> and standing in the community. Your conduct as a representative of the Company,
> if it does not comply with the law or with this Code, can result in serious
> consequences for both you and the Company.

116. Under the heading "Waivers of this Code," the Code of Conduct provides:

> Any waiver of this Code for our directors, executive officers or other principal
> financial officers may be made only by our Board of Directors and will be
> disclosed to the public as required by law or the rules of the NASDAQ, when
> applicable. Waivers of this Code for other employees may be made only by our
> Chief Executive Officer or General Counsel and will be reported to our Audit
> Committee.

117. Under the heading "COMPANY RECORDS," the Code of Conduct provides:

> Accurate and reliable records are crucial to our business. Our records are the basis
> of our earnings statements, financial reports, regulatory submissions and many
> other aspects of our business and guide our business decision-making and strategic

planning. Company records include financial records, personnel records, records relating to our technology and product development, clinical development, customer collaborations, manufacturing and regulatory submissions and all other records maintained in the ordinary course of our business.

All Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control. Please contact your supervisor or the Company's Legal and Compliance Department to obtain a copy of such policy or with any questions concerning any such policy.

118.    Under the heading "PROTECTION AND USE OF COMPANY ASSETS," the

Code of Conduct provides:

Employees should protect the Company's assets and ensure their efficient use for legitimate business purposes only and not for any personal benefit or the personal benefit of anyone else. Theft, carelessness and waste have a direct impact on the Company's financial performance. The use of Company funds or assets, whether or not for personal gain, for any unlawful or improper purpose is prohibited.

Employees should be aware that Company property includes all data and communications transmitted or received to or by, or contained in, the Company's electronic or telephonic systems. Company property also includes all written communications. Employees and other users of this property should have no expectation of privacy with respect to these communications and data. To the extent permitted by law, the Company has the ability, and reserves the right, to preserve and monitor electronic and telephonic communications. These communications may also be subject to disclosure to law enforcement or government officials.

119.    In violation of the Code of Conduct, the Individual Defendants conducted little, if

any, oversight of the Individual Defendants' schemes to issue materially false and misleading

statements to the public and to facilitate and disguise the Individual Defendants' violations of

law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control,

gross mismanagement, and violations of the Exchange Act. Additionally, two of the Individual

Defendants violate the Code of Conduct by engaging in lucrative insider trading while the

Company's stock price was artificially inflated as a result of the Individual Defendants breaching

their fiduciary duties to the Company by causing the Company to issue false and misleading statements. Also, in violation of Codes of Conduct, the Individual Defendants failed to maintain the accuracy of QOrtho's records and reports, failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

### QOrtho's Audit Committee Charter

120.    QOrtho's Audit Committee Charter (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

121.    The Audit Committee Charter, under the heading "Purpose," states the purpose of the Audit Committee as:

> is to represent and assist the Board in discharging its oversight responsibilities relating to the Company's accounting and financial reporting processes and the audits of the Company's financial statements.
>
> The Committee also has responsibilities relating to: (i) surveillance of the design and functioning of internal accounting, financial and disclosure controls; (ii) review of the independent registered public accounting firm's qualifications and independence; (iii) oversight of the Company's internal audit function; (iv) monitoring and evaluating the performance of the independent registered public accounting firm; (v) overseeing the Company's compliance with legal and regulatory requirements; and (vi) reviewing, setting policy and evaluating the effectiveness of the Company's processes for assessing significant risk exposures and measures that management has taken to minimize such risks.
>
> The Committee shall provide the report required by the rules of the SEC to be included in the Company's annual proxy statement.

122.    The Audit Committee Charter, under the heading "Duties and Responsibilities," states the following:

> 1. Appoint, retain, determine funding for, and, when appropriate, terminate the Company's independent registered public accounting firm, which firm shall report directly to the Committee. In its capacity as a committee of the Board, the

Committee shall be directly responsible for the appointment, compensation and oversight of the independent registered public accounting firm, including the sole authority and responsibility to select, evaluate and if necessary replace the independent registered public accounting firm.

2. Review and approve in advance all audit services to be provided by the independent registered public accounting firm and establish policies and procedures with respect to permissible non-audit services to be provided by the independent registered public accounting firm, which shall require pre-approval by the Committee for all such permissible non-audit services.

3. Provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

4. Periodically review, at least annually, the independence of the independent registered public accounting firm. In this regard, the Committee shall: (i) review and discuss with the independent registered public accounting firm the matters to be included in the written disclosures from the firm to the Committee required by professional independence standards applicable to the independent registered public accounting firm, including reviewing and discussing any relationship between the independent registered public accounting firm and the Company or any other relationships that may adversely affect the independence of the independent registered public accounting firm; (ii) actively engage in a dialogue with the independent registered public accounting firm with respect to any disclosed relationships or services that may impact the objectivity and independence of the outside auditor; (iii) consider whether the independent registered public accounting firm's performance of permissible non-audit services is compatible with the firm's independence; and (iv) present to the Board the Committee's conclusions with respect to the independence of the independent registered public accounting firm and take, or recommend that the full Board take, appropriate action to oversee the independence of the outside auditor.

5. Obtain and review, at least annually, a report by the independent registered public accounting firm describing: (i) the independent registered public accounting firm's internal quality-control procedures; and (ii) any material issues raised by the most recent internal quality-control review, or peer review, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, relating to one or more independent audits carried out by the independent registered public accounting firm, and any steps taken to deal with any such issues.

6. Review and discuss with the independent registered public accounting firm: (i) the scope of their audit, the results of the audit and any accompanying management letters, and any difficulties they may have encountered in the course of their audit, including any restrictions on the scope of their activities or on access to requested information, and any significant disagreements with management; and (ii) any of

their reports with respect to interim periods.

7. Determine that the independent registered public accounting firm has a process in place to address rotation of the lead audit partner and other audit partners serving the account as required under SEC independence rules.

8. Establish policies and the parameters for the Company's hiring of employees and former employees of the independent registered public accounting firm.

9. Periodically review and discuss with the independent registered public accounting firm, management, the internal auditor and such others as the Committee deems appropriate, the adequacy and effectiveness of the Company's financial reporting processes and internal controls, the Company's report on internal control over financial reporting and the independent registered public accounting firm's attestation on internal control over financial reporting, including any significant changes in such controls or significant deficiencies or material weaknesses identified; and review and discuss with management or the principal internal auditor of the Company and such others as deemed appropriate, the scope and results of the Company's internal audit program.

10. Review and discuss with management and the independent registered public accounting firm the Company's annual and quarterly financial statements, and annual and quarterly reports on Forms 10-K and 10-Q, respectively, prior to filing with the SEC, including: (i) an analysis of the independent registered public accounting firm's judgment as to the quality of the Company's accounting principles; (ii) the Company's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations;" (iii) the reasons for material variances of actual financial results from the annual budget as approved by the Board; and (iv) any certification, report, opinion or review rendered by the independent registered public accounting firm with respect to such reports. The Committee shall recommend to the Board whether the financial statements should be included in the Company's Annual Report on Form 10-K.

11. Review and discuss with management and the independent registered public accounting firm the accounting policies that may be viewed as critical, including critical auditing matters communicated by the firm, and any significant changes in the accounting policies of the Company and accounting and financial reporting rule changes that may have a significant impact on the Company's financial reports.

12. Periodically review and discuss the adequacy of the Company's disclosure controls and procedures and management reports thereon.

13. Review and discuss generally the information to be disclosed and the presentation to be made in the Company's earnings and press releases involving results of operations, financial condition or forecasts.

14. Review and approve the Company's policy for the investment of liquid

assets.

15. Review and discuss with management and the independent registered public accounting firm (i) any material financial or non-financial arrangements of the Company that do not appear on the financial statements of the Company; and (ii) any transactions or course of dealings with related parties that are significant in size or involve terms or other aspects that differ from those that would likely be negotiated with independent third parties and are relevant to an understanding of the Company's financial statements.

16. Review and discuss with management and the independent registered public accounting firm proposed and recently adopted accounting principles and standards and the potential impact to the Company.

17. Review and discuss the Company's policies and practices with respect to risk assessment and risk management, and oversee risks related to the Company's financial statements and financial reporting process, compliance and information technology and cybersecurity.

18. Oversee the Company's public reporting regarding environmental, social and governance ("ESG") matters, including disclosures related to climate change risk and the Company's greenhouse gas emissions, and discuss with management related risks, controls and procedures.

19. Review and approve, as appropriate, all related party transactions involving directors, executive officers and other related parties in accordance with the Company's Related Party Transaction Policy and Procedures.

20. Oversee the Company's compliance program with respect to legal and regulatory requirements, including the Company's Code of Business Conduct and Ethics and the Company's policies and procedures for monitoring compliance; and at least annually, meet to review the implementation and effectiveness of the Company's compliance program with the General Counsel and the Vice President, Compliance, who shall each have the authority to communicate directly with the Audit Committee, promptly, about actual and alleged violations of law or the Company's Code of Business Conduct and Ethics, including any matters involving criminal or potential criminal conduct.

21. Review material, pending legal proceedings, and other contingent liabilities involving the Company.

22. Establish procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls and auditing matters, including procedures for confidential, anonymous submissions of complaints or concerns by employees regarding questionable accounting and auditing matters and review quarterly with management such processes and procedures.

23. Evaluate annually the performance of the Committee and review this Charter

recommending any changes to the Board, accordingly.

24. Regularly report to the Board with respect to the Committee's meetings and activities.

123.    In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

124.    Founded in 1979, Quidel was originally incorporated in California as "Monoclonal Antibodies Inc." In 1987, Quidel reincorporated in Delaware under the name "Quidel Corporation." Quidel focuses on designing, identifying, and diagnosing medical conditions through rapid diagnostic testing solutions, with a special focus on respiratory illnesses. The Company's products were divided into four categories: (1) rapid immunoassay; (2) cardiometabolic immunoassay; (3) molecular diagnostic solutions; and (4) specialized diagnostic solutions. Quidel marketed its products through a network of distributors and a direct sales force. Quidel operated in one business segment that developed, manufactured and marketed its products internationally.

125.    Quidel sold products directly to end users and distributors for individual, non-professional OTC use as well as for professional use in physician offices, hospitals, clinical laboratories, reference laboratories, urgent care clinics, universities, retail clinics, pharmacies and wellness screening centers.

126.    Before the COVID-19 pandemic, Quidel's business largely sold seasonal flu tests. However, once the pandemic emerged, Quidel extended its product offerings to COVID-19 detection tests. Since then, Quidel's revenue primarily came from selling COVID-19 tests to government organizations, well-known pharmacy chains, and healthcare providers through authorized distributors.

127.    Ortho originated as a public limited company organized under the laws of England and Wales. On December 1, 2021, Ortho held an IPO and began to sell its shares on NASDAQ under the symbol "OCDX."

128.    Ortho was a leading global provider of IVD solutions to the clinical laboratory and transfusion medicine communities. Ortho's business model revolved around the global distribution of IVDs, instruments, assays, reagents and other consumables to clinical laboratories, blood banks and hospitals.

129.    Ortho maintained a massive distribution network that spanned more than 130 countries and territories, with a direct presence in 36 countries. Ortho's instruments, assays, reagents and other consumables were used in hospitals, laboratories, clinics, blood banks and donor centers worldwide. Ortho was globally operated with manufacturing facilities in the United States and the United Kingdom and with sales centers, administrative offices and warehouses internationally.

130. Just before the Relevant Period, in December 2021, Quidel announced that Quidel and Ortho would combine through a merger worth approximately $6 billion.

131. On April 11, 2022, Quidel and Ortho filed the Merger Proxy Statement. Defendants Bryant, Buechler, Michael, Polan, Rhoads, Strobeck, Widder, Wilkins, Schmidt, Smith, and Wise solicited shareholder approval of eight proposals in the Merger Proxy Statement, including, *inter alia*,: (1) the Merger; (2) the election of Bryant, Buechler, Michael, Polan, Rhoads, Strobeck, Widder, Wilkins, Schmidt, Smith, and Wise as directors; and (3) the Incentive Plan Proposal, which increased the number of shares available for issuance under the Incentive Plan by 1,500,000.

132. Quidel shareholders approved the Merger, along with the other proposals, including the Incentive Plan Proposal, on May 16, 2022.

133. By the time the Merger closed on May 27, 2022, COVID-19 was already endemic in the United States. However, before, during, and after the Merger, the Individual Defendants represented that, despite COVID-19 becoming endemic, QOrtho remained poised to maintain revenue figures from selling COVID-19 tests and other products relating to the Company's respiratory business. The Individual Defendants further represented that the Merger would expand QOrtho's revenue by allowing the combined company to utilize cross-selling opportunities and cost synergies through supply chain optimization and shared executive functions.

134. Additionally, the Individual Defendants represented that QOrtho planned to launch a new viral respiratory test called the Savanna as its "new flagship product" through Ortho's robust distribution network. Indeed, the Individual Defendants emphasized that sales

from Savanna would become an essential facet of the Company's respiratory business. During the Relevant Period, the Savanna was not approved by the FDA to be sold or marketed in the U.S.

135.    During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) QOrtho oversold COVID-19 tests to pharmacy chains and distributors in excess of what the clients could resell to end customers and healthcare providers; (2) as a result, the supply chain was saturated because pharmacy chains and distributors held excess inventory of COVID-19 tests; (3) as a further result, distributors and pharmacy chains significantly lowered their COVID-19 test orders from QOrtho; (4) undisclosed issues with the Savanna would delay the Savanna's entry into the U.S. market; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the amendment increasing the number of shares available under the Incentive Plan; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### False and Misleading Statements

#### *February 17, 2022 Press Release*

136.    On February 17, 2022, after the market closed, Quidel issued a press release announcing its financial results for the fourth quarter and full year for the fiscal year ended December 31, 2021 ("Fiscal Year 2021"). The press release stated that Fiscal Year 2021's fourth

quarter revenue for COVID-19 products was $511.8 million, as compared to $405.3 million for the fourth quarter of the prior fiscal year. The press release also stated that Quidel would not provide financial guidance for Fiscal Year 2022 because of the upcoming Merger.

### February 17, 2022 Earnings Call

137.    On that same day and also after the market closed, Quidel held an earnings conference call to discuss Quidel's financial results for the fourth quarter and full year of Fiscal Year 2021. During the call, Defendant Bryant boasted that there was "strong demand for COVID-19 rapid immunoassay products for both Sofia and QuickVue." He additionally stated:

> In January, *we saw incredibly strong demand for our Sofia COVID-19 antigen test in the professional market as well as demand for our QuickVue At-Home product as a result of elevated COVID-19 case counts*. As we move closer to the end of February, we are seeing demand moderate in the professional and retail markets commensurate with lower COVID-19 positive cases but bolstered by the continued fulfillment of state and U.S. government orders as COVID-19 shifts from a pandemic to what some scientists anticipate as an endemic phase.

### February 18, 2022 Form 10-K

138.    The following day, on February 18, 2022, Quidel filed its annual report on Form 10-K with the SEC for Fiscal Year 2021 (the "2021 10-K"). Defendants Bryant, Steward, Buechler, Michael, Polan, Rhoads, Strobeck, Widder, and Wilkins signed the 2021 10-K, and the 2021 10-K contained certifications pursuant to Rule 13(a)-14(a) and 15d-14(a) under the Exchange Act and Sarbanxes- Oxley Act of 2002 ("SOX") signed by Defendant Bryant and Defendant Steward attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its controlling shareholders, officers, or its directors.

139.    The 2021 10-K conveyed the following hypothetical risk factor, in relevant part:

> *Our operating results are heavily dependent on sales of our COVID-19 and influenza diagnostic tests and if sales or revenues of our COVID-19 or influenza*

*tests decline for any reason, our operating results would be materially and adversely affected.*

A significant percentage of our total revenues come from a limited number of our product families. In particular, revenues from the sale of our COVID-19 and influenza tests represent a significant portion of our total revenues and are expected to remain so for at least the near future. For the years ended December 31, 2021, 2020 and 2019, sales of our COVID-19 products accounted for 75%, 70% and 0% and influenza products accounted for 4%, 8%, and 26%, [respectively], of total revenue. In addition, the gross margins derived from sales of our COVID-19 and influenza tests are significantly higher than the gross margins from many of our other core products. As a result, if sales or revenues of our COVID-19 or influenza tests decline for any reason, whether as a result of a waning of the COVID-19 pandemic, a mild flu season, market share loss or price pressure, obsolescence, regulatory matters, such as loss of EUAs for our COVID-19 products, or any other reason, our operating results would be materially and adversely affected on a disproportionate basis.

### March 11, 2022 Amended Form 10-K

140.    On March 11, 2022, the Company filed a Form 10-K/A to amend the 2021 10-K (the "Amended 2021 10-K"). Defendant Bryant signed the Amended 2021 10-K, and the Amended 2021 10-K contained SOX certifications signed by Defendants Bryant and Defendant Steward attesting to the accuracy of the financial statements contained in the Amended 2021 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

### April 11, 2022 Merger Proxy Statement

141.    On April 11, 2022, Quidel and Ortho filed the Merger Proxy Statement with the SEC pursuant Section 14(a) of the Exchange Act. Defendants Bryant, Buechler, Michael, Polan, Rhoads, Strobeck, Widder, Wilkins, Schmidt, Smith, and Wise solicited the Merger Proxy Statement, which contained material misstatements and omissions and failed to correct prior misstatements.

142.    The Merger Proxy Statement solicited shareholder approval of eight proposals, including, *inter alia*,: (1) the Merger; (2) the election of Defendants Bryant, Buechler, Michael, Polan, Rhoads, Strobeck, Widder, Wilkins, Schmidt, Smith, and Wise as directors to the Company's Board; and (3) the Incentive Plan Proposal, which certain Individual Defendants would be eligible to receive material personal benefits from.

143.    The purpose of the Incentive Plan was to "promote Quidel's and its stockholders' interests by using equity interests in Quidel to attract, retain and motivate its directors, management, employees and other persons, to encourage and reward their contributions to Quidel's performance and to align their interests with the interests of Quidel's stockholders."

144.    The Merger Proxy Statement noted that if the Quidel shareholders approved the Incentive Plan Proposal, "no additional awards will be granted under Ortho's equity compensation plans." The Merger Proxy Statement further noted that as of March 4, 2022, "1,350,265 shares remained available for future issuance under the 2018 Plan" and "the weighted average exercise price of the outstanding options was $69.84 with a weighted average remaining term of 6.54 years." Therefore, if the Quidel shareholders approved the Incentive Plan Proposal, "approximately 2,850,265 shares will be available for future awards under the [Incentive] Plan, consisting of 1,500,000 new shares and approximately 1,350,265 remaining shares previously authorized and available for issuance under the [Incentive] Plan."

145.    Under the Incentive Plan, "no non-employee director participant" in the Incentive Plan "may be granted cash and awards under" the Incentive Plan that exceeds "$750,000 in total value during a single calendar year."

146.    Regarding "Board Leadership Structure and Risk Oversight," the Merger Proxy Statement stated the following as to risk management and the Board's oversight, in relevant part:

> Quidel takes a comprehensive approach to risk management. Quidel believes risk can arise in every decision and action taken, whether strategic or operational. Quidel, therefore, seeks to include risk management principles in all of its management processes and in the responsibilities of its employees at every level. Quidel's comprehensive approach is reflected in the reporting processes by which its management provides timely and comprehensive information to the Quidel board of directors to support the Quidel board of directors' role in oversight, approval and decision-making.

147.    Regarding waivers of the Company's Code of Conduct, the Merger Proxy Statement stated the following:

> Quidel has adopted a Code of Business Conduct and Ethics that applies to all its officers, directors and employees. If Quidel grants any amendment or waiver, including any implicit waiver, to its principal executive, financial or accounting officers (or persons performing similar functions), Quidel will disclose the nature of such amendment or waiver on Quidel's website at www.quidel.com or in a report on Form 8-K in accordance with applicable rules and regulations.

148.    Regarding the demand for COVID-19 tests, the Merger Proxy Statement stated the following, in relevant part:

> In response to increased COVID-19 testing demand, Quidel is continuing to rapidly and significantly expand its manufacturing capacity, including expanding and scaling its infrastructure to support existing and anticipated COVID-19 testing demand and commercial activities. This rapid expansion has placed and may continue to place significant strain on Quidel's management, personnel, operations, systems and financial resources. Failure to successfully manage this expansion, including due to inefficiencies in implementing such expansion or higher costs for materials, technology, equipment and human capital during the intensity of the COVID-19 pandemic, could negatively affect Quidel's or Topco's operating results.

149.    Regarding COVID-19's evolving effect on the Company's business, the Merger Proxy Statement stated the following, in relevant part:

> The extent to which the COVID-19 pandemic, in particular, impacts Ortho's business or results will depend on future developments, which are highly uncertain and cannot be predicted, including new information which may emerge concerning the severity and duration of the COVID-19 pandemic and the actions to contain it or treat its impact, among others.

150.     Defendants Bryant, Buechler, Michael, Polan, Rhoads, Strobeck, Widder, Wilkins, Schmidt, Smith, and Wise caused the Merger Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) QOrtho oversold COVID-19 tests to pharmacy chains and distributors in excess of what the clients could resell to end customers and healthcare providers; (2) as a result, the supply chain was saturated because pharmacy chains and distributors held excess inventory of COVID-19 tests; (3) as a further result, distributors and pharmacy chains significantly lowered their COVID-19 test orders from QOrtho; (4) undisclosed issues with the Savanna would delay the Savanna's entry into the U.S. market; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the amendment increasing the number of shares available under the Incentive Plan; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

151.     The Merger Proxy Statement also was false and misleading because it failed to disclose that: (1) through the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the Merger Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

152.     As a result of Defendants Bryant, Buechler, Michael, Polan, Rhoads, Strobeck, Widder, Wilkins, Schmidt, Smith, and Wise causing the Merger Proxy Statement to be false and misleading, Quidel shareholders voted to, *inter alia*,: (1) elect Defendants Bryant, Buechler,

Michael, Polan, Rhoads, Strobeck, Widder, and Wilkins to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) appoint Ernst & Young ("EY") as the Company's independent registered public accounting firm for Fiscal Year 2022; and (3) approve the Incentive Plan Proposal to increase the number of shares available under the Incentive Plan by 1,500,000 shares.

153.    As a result of the shareholders approving the Incentive Plan Proposal, there were 2,850,265 shares available for issuance under the amended Incentive Plan after the Merger. According to the 2024 Proxy Statement, as of December 31, 2023, only 1,265,845 shares were available under the amended Incentive Plan—disclosing that 1,584,420 shares were paid out to the officers and directors of the Company between the Merger and the end of Fiscal Year 2023, which constituted 234,155 shares more than the pre-vote remaining amount of 1,350,265 shares. For this reason, the Individual Defendants, including many who are currently directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading Merger Proxy Statement and the shareholders approving the Incentive Plan Proposal. Moreover, certain of the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the Incentive Plan.

### *May 4, 2022 Press Release*

154.    On May 4, 2022, Quidel issued a press release that reported Quidel's financial results for the first quarter of Fiscal Year 2022 ended on March 31, 2022. The press release stated that Fiscal Year 2022's first quarter revenue for COVID-19 products was $836.1 million, as compared to $269.1 million for the first quarter of Fiscal Year 2021. The press release also stated

that Quidel would not provide financial guidance for Fiscal Year 2022 because of the upcoming Merger.

### May 4, 2022 Earnings Call

155.     On that same day, Quidel held an earnings conference call with investors and analysts to discuss Quidel's financial results for the first quarter of Fiscal Year 2022. During the call, Defendant Bryant represented that "consistent with the anticipated shift in COVID-19 testing demand, we continue to bolster our resilience in the post-pandemic future by accelerating assay development and production and further expanding our footprint at the point of care."

156.     Defendant Bryant further stated:

> Total rapid immunoassay revenue increased by $655 million in the first quarter '22 to $893 million. *We saw significant sales of QuickVue At-Home OTC COVID-19 tests. And while COVID-19 testing made up the bulk of this heightened demand*, it's noteworthy that non-COVID sales grew 56%.

### May 5, 2022 Form 10-Q

157.     On May 5, 2022, the Company filed with the SEC a Form 10-Q reporting its financial results for the first quarter of Fiscal Year 2022 (the "2022 1Q 10-Q"). Defendants Bryant and Steward signed the 2022 1Q 10-Q and contained SOX certifications signed by Defendant Bryant and Defendant Steward attesting to the accuracy of the financial statements contained in the 2022 1Q 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

158.     The 2022 1Q 10-Q stated that there was "no material change to the risk factors as previously disclosed in [the 2022 10-K]."

### August 4, 2022 Press Release

159.     On August 4, 2022, the Company issued a press release announcing its financial results for the second quarter of Fiscal Year 2022 ended on July 3, 2022. The press release

reported that Fiscal Year 2022's second quarter revenue for COVID-19 products was $298 million, as compared to $280.3 million for the second quarter of Fiscal Year 2021.

### *August 4, 2022 Earnings Call*

160.    That same day, the Company held an earnings conference call with investors and analysts to discuss the Company's financial results for the second quarter of Fiscal Year 2022. During the call, Defendant Bryant stated, "In terms of the OTC space, we continue to strengthen our positioning throughout QuickVue at-home OTC COVID-19 test." Furthermore, Defendant Busky stated that "we believe that the COVID revenue once it gets into endemic stage, as you move into next year, we'll be in that $150 million to $200 million range annual COVID revenue."

### *August 5, 2022 Form 10-Q*

161.    On August 5, 2022, the Company filed with the SEC a Form 10-Q reporting its financial results for the second quarter of Fiscal Year 2022 (the "2022 2Q 10-Q"). Defendants Bryant and Busky signed the 2022 2Q 10-Q and the 2022 2Q 10-Q contained SOX certifications signed by Defendant Bryant and Defendant Busky attesting to the accuracy of the financial statements contained in the 2022 2Q 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

162.    The 2022 2Q 10-Q stated the following regarding demand for the Company's COVID-19 products, in relevant part:

> **Fluctuations or a decline in sales of our COVID-19 and influenza diagnostic tests can have a significant impact on our operating results and if sales or revenues of our COVID-19 or influenza tests fluctuate or decline for any reason, our operating results could be materially and adversely affected.**
>
> A significant percentage of our total revenues come from a limited number of our product families. In particular, revenues from the sale of our COVID-19 tests have recently represented a significant portion of our total revenues. Sales of our

COVID-19 products accounted for approximately 70% of our total revenue for the six months ended July 3, 2022. Demand for our COVID-19 testing products can fluctuate or decline as a result of a number of factors, including but not limited to the emergence and impact of new variants, the effectiveness of global containment efforts, and increased market supply of COVID-19 tests by our competitors. Similarly, demand for our influenza tests can fluctuate or decline based on the severity of the flu season. The gross margins derived from sales of our COVID-19 and influenza tests are significantly higher than the gross margins from many of our other core products. As a result, if sales or revenues of our COVID-19 or influenza tests fluctuate or decline for any reason, whether as a result of a waning of the COVID-19 pandemic, a mild flu season, market share loss or price pressure, obsolescence, regulatory matters, such as loss of EUAs from the FDA for our COVID-19 products, or any other reason, our operating results would be materially and adversely affected on a disproportionate basis.

### *November 2, 2022 Press Release*

163.    On November 2, 2022, the Company issued a press release announcing its financial results for the third quarter of Fiscal Year 2022 that ended on October 2, 2022. The press release reported that Fiscal Year 2022's third quarter revenue for COVID-19 products was $171 million, as compared to $402.6 million for the third quarter of Fiscal Year 2021.

### *November 2, 2022 Earnings Call*

164.    That same day, the Company held an earnings conference call with analysts and investors to discuss Quidel's financial results for the third quarter of Fiscal Year 2022. During the call, Defendant Bryant and Busky reiterated to investors that endemic COVID-19 revenue would fall between $150 million and $200 million for Fiscal Year 2022. Defendant Busky went as far as to call this revenue projection "conservative."

### *November 4, 2022 Form 10-Q*

165.    On November 4, 2022, the Company filed with the SEC a Form 10-Q reporting its financial results for the third quarter of Fiscal Year 2022 (the "2022 3Q 10-Q"). Defendants Bryant and Busky signed the 2022 3Q 10-Q and the 2022 3Q 10-Q contained SOX certifications signed by Defendant Bryant and Defendant Busky attesting to the accuracy of the financial

statements contained in the 2022 3Q 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

166.    The 2022 3Q 10-Q stated that there was "no material change in our risk factors as previously disclosed in [the Q2 2022 10-Q]."

### December 13, 2022 Investor Day

167.    On December 13, 2022, the Company held its Investor Day for Fiscal Year 2022. During the Investor Day, e Defendant Busky stated that the demand for the Company's products was so high that the Company's supply chain could not keep up with demand:

> The next item on the list again, it's investing back in the business, and this is more an operational excellence area. We will invest CapEx. We are investing. We will continue to invest CapEx into the business to increase the manufacturing capacity. I think Doug said this earlier, too, *we don't have so much of a demand problem right now. We have a supply problem. We got to get more products*.

### February 15, 2023 Press Release

168.    On February 15, 2023, the Company issued a press release announcing its financial results for the fourth quarter and full year of Fiscal Year 2022. The press release stated that Fiscal Year 2022's fourth quarter revenue for COVID-19 products was $132 million, as compared to $511.8 million for the fourth quarter of Fiscal Year 2022.

### February 15, 2023 Earnings Call

169.    On the same day, February 13, 2023, the Company held an earnings conference call where Defendant Busky stated guidance for "[r]espiratory revenue of $610 million to $875 million, which includes COVID revenue of $300 million to $500 million" for Fiscal Year 2023.

170.    Defendant Busky elaborated, in relevant part:

> Going forward, although there may be spikes and no one really knows for sure, we assume COVID-19 transitions to an endemic state. Similar to other seasonal

respiratory viruses and we plan to bucket it with those other respiratory viruses in '23 and forward. And while 2022 included a record-setting respiratory season, including flu and COVID-19, we expect '23 to return to a more normal respiratory season. ***We expect to continue to capture and grow our share of the respiratory market underpinned by our large and growing Sofia placements.***

171.    Also, during the call, an analyst asked Defendants Bryant and Busky the following question about future revenue for COVID-19 products, in relevant part:

But just to kind of jump into it, one thing I think investors are certainly going to be keyed into is the commentary for 2023 being normal and that $300 million to $500 million of COVID, I think it sounds like it does include those government contracts or at least some contribution from. So can you give us a sense for where you're sort of settling out of what normal might be for COVID? And how that's going to play out through the course of the year kind of in context of Joe, what you just said about some of the seasonality in flu and respiratory in general?

Defendant Bryant replied:

Yes. Andrew, we did go -- the $300 million to $500 million is still our range. So that's consistent, and we can talk about the government contracts. But that's -- we're not treating that as normal and usual.

Then, Defendant Busky stated the following:

Yes. And it is exactly. ***It's consistent with what we said at Investor Day, we were saying $200 to $400 million for endemic state, and it's up $300 million to $500 million because you've got this level of government contracts that we know we have in hand.*** So that's -- there's no change there.

172.    Another analyst then asked Defendants Bryant and Busky about the future of the respiratory business, asking the following question:

Okay. So just getting back to the respiratory business, if you just think about kind of all of the moving pieces for this year, including the government contract on COVID, going into next year and not getting into next year's guidance. But just going forward, how should we think about the total respiratory business size wise, including all of that? And then once you do have Savanna, how does that change the size of that business?

Defendant Bryant responded by stating, "Yes, go ahead, Joe." Defendant Busky then stated the following:

Yes, I can start. And again, breaking it up into the pieces, Conor. I think we would, again, go back to the **COVID $200 million to $400 million**, and the rapid flu in the $230 million to $270 million. Those are the 2 base numbers. And then the Savanna number, that number is a little bit of a TBD as you move into '24, obviously because it's going to be based on the slope of the ramp or the launch because some of that Savanna revenue is going to be respiratory, the RVP4 and RVP11. And then you've got that other piece I mentioned the RSP and the strep, we call it, $80 million to $100 million. And so those are your pieces as you move forward.

*February 23, 2023 Form 10-K*

173.    On February 23, 2023, the Company filed its annual report on Form 10-K with the SEC for Fiscal Year 2022 (the "2022 10-K"). Defendants Bryant, Busky, Buechler, Dislaver, Michael, Polan, Rhoads, Schmidt, Smith, Strobeck, Widder, Wilkins, and Wise signed the 2022 10-K and the 2022 10-K contained SOX certifications signed by Defendant Bryant and Defendant Busky attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its controlling shareholders, officers, or its directors.

174.    The 2022 10-K conveyed the following about COVID-19's impact on the Company, in relevant part:

**Fluctuations or a decline in sales of our COVID-19 and influenza diagnostic tests can have a significant impact on our operating results and if sales or revenues of our COVID-19 or influenza tests fluctuate or decline for any reason, our operating results could be materially and adversely affected.**

A significant percentage of our total revenues is generated from a limited number of our product families. In particular, revenues from the sales of our COVID-19 tests have represented a significant portion of our total revenues. Sales of our COVID-19 products accounted for approximately 44% of our total revenues for the year ended January 1, 2023, which includes the impact of Ortho's operations from the date of the Combinations. Demand for our COVID-19 testing products has and may continue to fluctuate or decline as a result of a number of factors, including but not limited to the emergence and impact of new variants or resurgences, the effectiveness of global containment efforts, and the increased market supply of COVID-19 tests by our competitors. Sales of our influenza tests accounted for approximately 11% of our total revenues for the year ended January 1, 2023, which includes the impact of Ortho's operations from the date

of the Combinations. Demand for our influenza tests can fluctuate or decline based on the severity of the flu season. The gross margins derived from sales of our COVID-19 and influenza tests are generally significantly higher than the gross margins from many of our other core products. As a result, if sales or revenues of our COVID-19 or influenza tests fluctuate or decline for any reason, whether as a result of a waning of the COVID-19 pandemic, a mild flu season, market share loss or price pressure, obsolescence, regulatory matters, such as loss of EUAs from the FDA for our COVID-19 products, or any other reason, our operating results would be materially and adversely affected on a disproportionate basis.

### March 7, 2023 Raymond James Institutional Investors Conference

175.    On March 7, 2023, the Company participated in the Raymond James Institutional Investors Conference. During the conference, Defendant Bryant was questioned about QOrtho's endemic COVID-19 Guidance by analyst Andrew Cooper, who asked the following question:

And, I guess while we're on the topic, let's go ahead and kind of hit on respiratory. You're pointing folks to $200 million to $400 million of endemic COVID. First, I feel sorry that you have to put a number out there in the first place because nobody can really nail down what it is. But can you talk to us a little bit about how you arrived at that $200 million to $400 million number in context of sort of where flu was for you, and where are some of the drivers of that being the right range really come from?

Defendant Bryant replied:

Yes. We—typically, finance organizations will look at it, at least a couple of different ways and one from a top down and what's logical, and looking at historic data in the professional segment. I think, that's a reasonable way. We also rely on marketers to more of a bottoms-up approach and almost do an account-by-account analysis.

Now it's a little difficult because when you look at the total number of customers that we have, respiratory customers, it's about -- in the United States, it's about 93,000 and it is a little bit of an overlap. So we're double counting customers that actually run QuickVue and Sofia. But Sofia customers, it's approximately 21,400. QuickVue customers, it's about 72,000. So it's kind of hard to do a complete bottoms-up by name, but *I think, they do a pretty good job of coming at it from a couple of different ways. And it's a pretty big range to $200 million to $400 million.*

### April 5, 2023 Proxy Statement

176.    On April 5, 2023, QOrtho filed a proxy statement on Schedule 14A, pursuant Section 14(a) of the Exchange Act, (the "2023 Proxy Statement") with the SEC. Defendants Bryant, Busky, Buechler, Dilsaver, Michael, Polan, Rhoads, Schmidt, Smith, Strobeck, Widder, Wilkins, and Wise solicited the 2023 Proxy Statement which contained material misstatements and omissions.

177.    The 2023 Proxy Statement called for shareholders to vote in favor of eight proposals, including, *inter alia*, the re-election of Defendants Bryant, Busky, Buechler, Dilsaver, Michael, Polan, Rhoads, Schmidt, Smith, Strobeck, Widder, Wilkins, and Wise to the Board, the approval, on a non-binding advisory basis, of certain executive compensation, and the ratification of E&Y as the Company's independent registered public accounting firm for Fiscal Year 2023.

178.    Regarding the Company's "Risk Oversight," the 2023 Proxy Statement stated the following as to risk management, in relevant part:

> We take a comprehensive approach to risk management. We believe risk can arise in every decision and action taken by the Company, whether strategic or operational. We, therefore, seek to include risk management principles in all of our management processes and in the responsibilities of our employees at every level. Our comprehensive approach is reflected in the reporting processes by which our management provides timely and comprehensive information to the Board to support the Board's role in oversight, approval and decision-making.
>
> The Board evaluates the information it receives from management and provides oversight and guidance to our management team concerning the assessment and management of risk. The Board approves the Company's high-level operating objectives, goals, strategies and policies to set the tone and direction for appropriate risk taking within the business. The Board and its committees then emphasize this tone and direction in their oversight of management's implementation of the Company's operating objectives, goals, strategies and policies.
>
> Our senior executives provide the Board and its committees with regular updates about the Company's strategies and objectives and the risks inherent within them at Board and committee meetings and in regular reports. Board and committee meetings also provide a venue for directors to discuss issues with management. The Board and its committees call special meetings when necessary to address specific issues or take specific actions. In addition, our directors have access to Company

management at all levels to discuss any matters of interest, including those related to risk. Those members of management most knowledgeable about the issues often attend Board meetings to provide additional insight into items being discussed, including risk exposures.

179.    Regarding the Company's Code of Conduct, the 2023 Proxy Statement stated the following, in relevant part:

> We have adopted a Code of Business Conduct and Ethics that applies to all of our officers, directors and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. If we make any amendments or grant any waivers, including any implicit waivers, to our principal executive, financial or accounting officers (or persons performing similar functions), we intend to disclose the nature of such amendment or waiver on our website at *www.quidelortho.com* or in a Current Report on Form 8-K to the extent required by applicable rules and regulations.

180.    Defendants Bryant, Busky, Buechler, Dilsaver, Michael, Polan, Rhoads, Schmidt, Smith, Strobeck, Widder, Wilkins, and Wise caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) QOrtho oversold COVID-19 tests to pharmacy chains and distributors in excess of what the clients could resell to end customers and healthcare providers; (2) as a result, the supply chain was saturated because pharmacy chains and distributors held excess inventory of COVID-19 tests; (3) as a further result, distributors and pharmacy chains significantly lowered their COVID-19 test orders from QOrtho; (4) undisclosed issues with the Savanna would delay the Savanna's entry into the U.S. market; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the amendment increasing the number of shares available under the Incentive Plan; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

181.    The 2023 Proxy Statement also was false and misleading because it failed to disclose that: (1) through the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

182.    As a result of Defendants Bryant, Busky, Buechler, Dilsaver, Michael, Polan, Rhoads, Schmidt, Smith, Strobeck, Widder, Wilkins, and Wise causing the 2023 Proxy Statement to be false and misleading, shareholders voted to, *inter alia*, reelect Defendants Bryant, Busky, Buechler, Dilsaver, Michael, Polan, Rhoads, Schmidt, Smith, Strobeck, Widder, Wilkins, and Wise to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, and to appoint EY as the Company's independent registered public accounting firm for Fiscal Year 2023.

### *May 3, 2023 Press Release*

183.    On May 3, 2023, the Company issued a press release announcing its financial results for its first quarter of Fiscal Year 2023 that ended on April 2, 2023. The press release stated that the quarterly revenue for respiratory products for the first quarter of Fiscal Year 2023 was $265.6 million, as compared to $947.3 million for the first quarter of Fiscal Year 2022.

### *May 3, 2023 Earnings Call*

184.    On the same day, May 3, 2023, the Company held an earnings conference call with analysts and investors to discuss the Company's  first quarter of Fiscal Year 2023 financial performance. During the call, Defendant Bryant restated that "demand for diagnostics across the

health care continuum remained strong" and stated there was a "significant increase in global

demand for global testing."

185.    Additionally, during the call Defendant Bryant was asked the following question

by analyst Patrick Donnelly about the demand for respiratory products demand and about

QOrtho's endemic guidance:

> And then maybe just a quick one on the respiratory guide, basically put up a pretty nice beat this quarter, maintain the guide for the full year. Was that essentially, Joe, to your point about some pull forward of revs and then maybe wanting to derisk that second half ramp a little bit. There was quite a bit of focus on that post the guidance, as you know, so maybe just talk through how you approach that, given the results in the quarter.

Defendant Bryant replied:

> Let me start and then Joe will provide for more detail. ***But remember, in the endemic state, we had -- assuming that we are now in that pandemic state, we had forecasted that we would be doing $200 million to $400 million per year over the next few years, this year, next year and perhaps beyond that was how we derisked the number.***
>
> The 300 to 500 was to take under account federal orders that we knew we had already on hand and assumed that there would be some level of shipment. So all of that was shipped in the first quarter, a small amount, I think a tiny amount, maybe $4 million or so, we shipped in April as well, and now we're done with the fed orders. right? So I think that, that coupled with the run rate that we had forecasted plus a little bit of pull forward on the retail segment.
>
> As a number of the retail -- the large retailers actually had programs where patients would order product online, and then we go pick on that -- pick the product off stores, that sort of offset. ***So I think we're still very comfortable that moving forward will be in that 200 to 400 range for COVID.*** And this year, obviously, we're forecasting to be slightly higher.

***May 4, 2023 Form 10-Q***

186.    On May 4, 2023, the Company filed with the SEC its quarterly report for the first

quarter of Fiscal Year 2023 on Form 10-Q (the "2023 1Q 10-Q"). The 2023 1Q 10-Q was signed

by Defendant Bryant and Defendant Busky and contained SOX certifications signed by

Defendant Bryant and Defendant Busky attesting to the accuracy of the financial statements

contained in the 2023 1Q 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

### August 8, 2023 Press Release

187.    On August 8, 2023, the Company issued a press release announcing its financial outcomes for its second quarter of Fiscal Year 2023 that ended on July 2, 2023. The press release stated that the quarterly revenue was $89.0 million for respiratory products for the second quarter of Fiscal Year 2023, as compared to $339.1 million for the second quarter of Fiscal Year 2022.

### August 8, 2023 Earnings Call

188.    On the same day, August 8, 2023, the Company held an earnings conference call with analysts and investors to discuss the Company's second quarter of Fiscal Year 2023 financial performance. During the call,  Defendant Bryant stated:

> Turning to our Point-of-Care business unit. Respiratory revenue declined, driven by a reduction in our retail business as expected, following the end of the COVID-19 public health emergency in May and the continued transition to an endemic state. With insurance companies no longer supporting free at-home COVID-19 tests including our QuickVue over-the-counter test, our overall COVID-19 business faced a challenging comp on a year-over-year basis.
>
> And as reported by several other diagnostic companies, the end of the public health emergency had a significant dampening effect on molecular COVID test volumes. *For us, this helped to drive double-digit year-over-year growth of our Point-of-Care COVID business as many customers shifted testing for symptomatic patients back to antigen tests and more specifically to our Sofia SARS Antigen assay.*

189.    Additionally, on the same call, Defendant Busky stated:

> We now expect full year gross margins to be at the low end of our prior expectations of low to mid-50s due to product mix, including higher instrument revenues from the faster-than-expected drilling on the labs instrument open orders. Adjusted EBITDA margin expected of 26.9% to 27.7% in the range of $800 million to $830 million compared to our prior guidance of $815 million to $865 million.
>
> *And despite the reduction in our guidance for higher-margin COVID-related revenue, we are offsetting the full P&L impact of the revenue drop with expense*

*reductions*. Adjusted diluted EPS is now expected to be in the range of $4.85 to $5.30 compared to our prior guidance of $5.15 to $5.70.

### *August 9, 2023 Form 10-Q*

190.    On August 9, 2023, the Company filed with the SEC a Form 10-Q reporting its financial outcomes for the second quarter of Fiscal Year 2023 (the "2023 2Q 10-Q"). The 2023 2Q 10-Q was signed by Defendant Bryant and Defendant Busky and contained SOX certifications signed by Defendant Bryant and Defendant Busky attesting to the accuracy of the financial statements contained in the 2023 2Q 10-Q Form, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

### *September 12, 2023 Morgan Stanley Global Healthcare Conference*

191.    On September 12, 2023, certain of the Individual Defendants participated in the Morgan Stanley Global Healthcare Conference. During the conference, Defendant Bryant stated the following about sales relating to COVID-19:

> What I would say for the back half total guide, though, that this certainly derisks what we said we would do for the back half in terms of respiratory disease testing for both COVID and Influenza. And then further, I would say, it supports the notion what's happening right now supports our assertion that COVID is just another respiratory virus and it is now endemic. ***And we should expect, therefore, moving forward, 2024 and beyond to see $200 million to $400 million in COVID specifically COVID-only sales.*** And I would suggest that with the pending launch of the combination product in the OTC space that I think that product will be a winner for us. But -- so your question was, are we going to change the guide, I don't think so. I think it's been derisked though.

192.    Additionally, analyst Tejas Savant questioned Defendant Bryant about the Company's submission to the FDA for approval for of Savanna:

> So – and what about sort of FDA submission and 510(k) for the instrument? And then I think you had the RVP4 and HSV panels. What are the timelines for that in terms of U.S. approval?

Defendant Bryant responded:

we submitted 510 (k)'s at the end of July for HSV/VZV as well as respiratory panel. We've also submitted EUA for the respiratory panel. The 510 (k)'s both are under active review at the FDA, meaning that they've accepted the package and actually are – have sent us several series of questions to talk about what's in the package of the data, et cetera. And we have not heard anything back on the EUA, which I would suggest means that the package for the 510(k) must be reasonably suitable because they're pursuing that rather aggressively with us. So, I would also point to the fact that in the last month or so, we've had several the FDA clearances, for example, in lab business for CEA, CA 19-9 both of which are oncology markers. We've had approval for PTH, all were reviewed and cleared in a timely manner. ***So it would suggest to me that the FDA is now pretty much back on track in terms of its cadence of review and approval. So I think that portends well for us.***

***November 1, 2023 Press Release***

193.    On November 1, 2023, the Company issued a press release announcing its financial results for the third quarter of Fiscal Year 2023 that ended on October 1, 2023. The press release stated that the quarterly revenue for respiratory products for the third quarter of Fiscal Year 2023 was $185.4 million, as compared to $236.1 million for the third quarter of Fiscal Year 2022.

***November 1, 2023 Earnings Call***

194.    On the same day, November 1, 2023, the Company held an earnings conference call with analysts and investors to discuss the Company's third quarter of Fiscal Year 2023 financial performance. During the call, Defendant Bryant stated:

First, the ***strong and early respiratory demand in Q3 was mainly driven by high COVID-19 prevalence throughout the United States***. This will potentially be the first real flu season we see where COVID 19 rates immediately precede it, contributing to higher prioritization of our combo assay as disease stages converge. While the high COVID-19 rates were less pronounced than the 2022-2023 season, there is potential for a longer drop-off in overall season duration. If the timing in Australia translates to this hemisphere, the most aggressive growth in flu prevalence could occur early November, with peak prevalence sometime in early January.

***Both the overall market for respiratory testing and our respiratory business became significantly larger due to more testing in general, and significant share gains from competitors for us specifically***. We have a strong position in this

market and our respiratory diagnostic capabilities play an important role in combating both early and seasonal upticks of COVID-19, RSV and influenza, among others. We're also well positioned to manage any seasonal fluctuations, given our operations team's agility to respond to meet customer demand.

[…]

I'd like to leave you with one key takeaway, and that's we are the same successful respiratory company that we were prior to the global pandemic and the acquisition of Ortho Clinical Diagnostics. The key difference is that *the overall respiratory market, including COVID-19 now in its current endemic state, is significantly larger than it was pre-pandemic, and QuidelOrtho's position in the overall diagnostics market, including respiratory, is much stronger as a combined company than either company was on a stand-alone basis.*

*Contrary to some recent opinions, we believe, as evidenced by our results, the market, the diagnostics market is positioned for continued durable growth for many years to come.*

195.    Additionally, during the call, analyst Alexander Nowak asked Defendant Bryant

about FDA approval for Savanna, in relevant part:

And then so on Savanna, what has been the feedback so far at the FDA? And I'm sure they've had questions around the submission. And I've honestly forgotten, is this going to be a 510(k) or an EUA that we should get the approval at the end of this year?

Defendant Bryant replied:

Thanks for the question, Alex. We're super confident that we'll have approval for the box. And it will be approved by 510(k). We'll pursue CLIA waiver at our earliest opportunity. But it's not going to be in the EUA.

Analyst Alexander Nowak responded:

And that's 510 (k) for the RVP 4 as well, just to confirm.

To which Defendant Bryant confirmed:

That's correct. So *RVP 4 would be cleared*, HSV obviously is under active review as well.

Analyst Alexander Nowak then followed up:

Okay. Perfect. And then just an update on the high-volume cartridge manufacturing line.

To which Defendant Bryant answered:

> I don't have a further update. ***We're still targeting everything on track for midyear next year***.

### November 2, 2023 Form 10-Q

196.     On November 2, 2023, the Company filed with the SEC a Form 10-Q reporting its financial results for the third quarter of Fiscal Year 2023 (the "2023 3Q 10-Q"). The 2023 3Q 10-Q was signed by Defendant Bryant and Defendant Busky and contained SOX certifications signed by Defendant Bryant and Defendant Busky attesting to the accuracy of the financial statements contained in the 2023 3Q 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

197.     The 2023 3Q 10-Q stated that the Company had no "no material change in our risk factors as previously disclosed in [the 2022 10-K]."

### November 30, 2023 Evercore ISI HealthCONx Conference

198.     QOrtho participated in the Evercore ISI HealthCONx Conference on November 30, 2023. Defendant Bryant was questioned at the conference about the Company's endemic COVID profit guidance by analyst Vijay Kumar, who asked Defendant Bryant the following question:

> The -- I think a lot of us are -- actually one high-level question. A lot of your peers look at base business ex COVID and you guys took the path of guiding to respiratory versus non-respiratory. What was the thought process behind clubbing COVID along with respiratory revenues and breaking it out?

Defendant Bryant responded:

> We group it in respiratory because they're linked. And you would not -- ***so if you take ranges for COVID, and we've said $200 million to $400 million***, and you take a range for flu, we've called it $230 to $270. So we're a little bit tighter there. And you look at RSV and the other and Strep and you look at those ranges, you can't go to the mid across all of them. You can't go to the high or the low across

all of them. What we've seen is in years when in the fourth quarter, we saw a lot of COVID, it seemed to have crowded out flu.

199.    Analyst Vijay Kumar also asked Defendant Busky the following question at the

conference about the Company's endemic COVID guidance:

And some of the margin targets that you had laid out at your Analyst Day, I think, annual expansion, 25 to 50 basis points with EBITDA margins of 27% to 29% exiting '23. I know a lot has changed since then -- since deal announcement. What is the right base we should be thinking about margins, right, ex COVID? And what should be like the normal margin expansion cadence?

Defendant Busky replied:

Well, Vijay, there's no change in the guidance that we provided at that Analyst Day a year ago. We're still in that 27% to 29% range. And as you know, there's some variables that are going to impact the timing of when we get to that 27% to 29%. The biggest of which is going to be the slope and the pace of the Savanna launch and how dilutive those margins are during the launch and when we get the high-volume line up and running, which will make the margins accretive. You've also got the timing of the achievement of synergies that will impact that achievement of that target margin? ***And then you've got the level of endemic COVID and where you end up in that range of 200 to 400***.

***January 8, 2024 JPMorgan Healthcare Conference***

200.    On January 8, 2024, the Company attended the 42nd Annual JPMorgan

Healthcare Conference. During the conference, analyst Casey Woodring asked Defendant Bryant

the following question about the Company's endemic COVID guidance:

So you're guiding to 6% to 9% top line growth ex COVID over the longer term. Just want to clarify, since you've been splitting out kind of ex respiratory the last couple of quarters, is that 6% to 9% now ex respiratory? And then will you kind of continue to split out respiratory.

Defendant Bryant replied:

No, that's total and those same ranges that we had described, both at our -- excuse me, our Analyst Day, Investor Day, the last 1, they still haven't changed and we've been pretty much been -- we have been in those ranges. A couple of things have caused that to be different. For example, ***we said $200 million to $400 million on COVID. And -- but we didn't anticipate we were going to get that big government order in the first quarter. So we'll be higher than the range there***.

201. Also, during the conference, Casey Woodring questioned Defendant Bryant about the status of Savanna:

Doug, maybe in the last 2 minutes, we can talk about Savanna, exciting update a couple of weeks ago. Can you give us a sense of when we should expect the RV4 panel, should that be approved during the respiratory season here? And just kind of any update on what you've heard from the agency or anything?

Defendant Bryant replied by stating that **"well, we're in good shape. And I would commit to being in market before the end of the quarter."**

202. The statements referenced in ¶¶ 136-140, 154-175, and 183-201 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) QOrtho oversold COVID-19 tests to pharmacy chains and distributors in excess of what the clients could resell to end customers and healthcare providers; (2) as a result, the supply chain was saturated because pharmacy chains and distributors held excess inventory of COVID-19 tests; (3) as a further result, distributors and pharmacy chains significantly lowered their COVID-19 test orders from QOrtho; (4) undisclosed issues with the Savanna would delay the Savanna's entry into the U.S. market; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the amendment increasing the number of shares available under the Incentive Plan; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE AS FALSE AND MISLEADING STATEMENTS CONTINUE

*February 13, 2024 Press Release*

203.    On February 13, 2024, the truth began to emerge when the Company issued a press release that reported the Company's financial results for the fourth quarter of Fiscal Year 2023, which were significantly less than the Company's guidance. The press release revealed that the Company's, AEPS was *46% lower* than the average of analysts' expectations. QuidelOrtho blamed the poor AEPS performance on lower sales of COVID-19 tests from pharmacy chain customers and distributors during the quarter. The press release further revealed that QOrtho chopped its financial outlook for the 2024 fiscal year, including halving the Company's annual endemic COVID-19 revenue projections, from $200-$400 million to just $200 million.

204.    Additionally, the press release reported EBITDA figures 28% lower than analysts' average expectations of $271 million.

***February 13, 2024 Earnings Call***

205.    That same day, on February 13, 2024, the Company held an earnings call. During the call, analyst Alexander Nowak asked Defendant Bryant the following question about the Company's decreased guidance:

> So you provided an endemic respiratory rate for 2023, and you were very confident in it throughout the year and sales still came in below that. So before COVID, the respiratory business for Quidel stand-alone was roughly $150 million of sales. Now your endemic rate for 2024 as it said today is $460 million to $730 million. Now if you get this endemic rate wrong for 2024, there's a lot of downside. I guess the question is why do you think this new number is right?

Defendant Bryant replied:

> Thanks for the question, Alex. We think we have a pretty good understanding of market size, and we think the number of tests starting with flu, between $40 million and $60 million makes the most sense. We haven't seen something as low as $40 million in a while. And we wouldn't expect at this stage to see something more than $60 million. So I think we've pegged the market size correct. The question is what's your market share? Well, our market share actually has increased in the recent report that we saw this morning that increased slightly more than that. Well, the other factor is what's happening with your price. Well, our price basically is flat. And we've been able to take share in place Sofia analyzers with that same

66

price. We've also seen a shift towards the combo assay, which is super healthy. So obviously, very difficult to predict this market, which is why we're widening the range.

206.    However, on an earnings conference call held that same day, Defendant Bryant

continued to make false and misleading statements about the potential for the FDA to approve

Savanna for sale in the U.S. Specifically, Defendant Bryant stated that the following:

> *The status of the submission of the 510(k) is on track* per my previous comments. Recall that I had said that we expect to get clearance before the end of the first quarter. I think we're still on track for all that.
>
> […]
>
> Savanna has been a long time coming in the United States and our agenda at this point is clear, menu expansion and customer adoption. *We're advancing both with FDA review of our RVP4 panel and others in the queue. Our U.S. sales team is meeting this week, and I can assure you a successful Savanna commercial launch is on their menu as well*. As noted earlier, we will invest in the highergrowth immunohematology side of our Transfusion Medicine business.
>
> […]
>
> Our guidance also assumes minimal contribution of between $30 million to $50 million in respiratory revenues from Savanna RVP4, and we expect that the revenue to be primarily in the fourth quarter of 2024, given the timing of approvals for the respiratory indication, which we expect in Q1. *We continue to expect Savanna instrument placements of approximately 1,000 in 2024, which will pave the way for 2025 Savanna revenue growth.*

207.    Due to the poor guidance and weak results, several analysts instantly lowered their

ratings of QOrtho stock and voiced their apprehension. One analyst from William Blair, Andrew

Blackmann, articulated that management needed to "rebuild some credibility." Another financial

analyst from Raymond James, Andrew Cooper, observed the Individual Defendants' "fairly

deplorable communication and expectation setting both over the course of 2023 and even as

recently as [January 2024]." Another analyst from Craig Hallum, Alexander Norwak, stated that

"Q4 came in as one of the most surprising results we have seen in diagnostics in some time— and not in a pleasant way for shareholders."

208.    On this news, the price of the Company's common stock fell $21.50 per share, or approximately 32%, from a closing price of $66.77 on February 13, 2024, to close at $45.27 per share on February 14, 2024.

209.    Approximately one week later, on February 21, 2024, the truth continued to emerge when QOrtho's Board fired Defendant Bryant from his positions of President and CEO, positions he had held at the Company and at Quidel since December 2022 and March 2009, respectively. Relegated to his directorship on the Board, he resigned from the Board the same day his firing was announced, also on February 21, 2024.

210.    On April 2, 2024, the truth fully emerged when the Company revealed that it had withdrawn the 510(k) submission that sought FDA approval of Savanna in the U.S due to data on the new product not meeting expectations. Patrick Donnelly, a Citi analyst, stated that the Savanna was "expected to be a key driver of Savanna uptake in the respiratory season."

211.    On this news, the price of QOrtho stock fell $4.85, or approximately 10%, from a closing price of $47.00 on April 1, 2024, to close at $42.15 on April 2, 2024.

**Repurchases During the Relevant Period**

212.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of ***over $77.7 million*** to repurchase approximately 1,302,722 shares of its own common stock at artificially inflated prices from February 2022 through April 2024.

213.    According to the 2022 1Q 10-Q, between January 31, 2022 and February 27, 2022, the Company purchased 28,723 shares of its common stock for approximately $3,300,272.70 at an average price of $114.9 per share.[5]

214.    As the Company's stock was actually worth only $42.15 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $2,089,598.25 for repurchases of its own stock between January 31, 2022 and February 27, 2022.

215.    According to the 2022 1Q 10-Q, between February 28, 2022 and April 3, 2022, the Company purchased 25,412 shares of its common stock for approximately $2,530,526.96 at an average price of $99.58 per share.

216.    As the Company's stock was actually worth only $42.15 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $1,459,411.16 for repurchases of its own stock between February 28, 2022 and April 3, 2022.

217.    According to the 2022 2Q 10-Q, between April 4, 2022 and May 1, 2022, the Company purchased 1,043 shares of its common stock for approximately $123,960.55 at an average price of $118.85 per share.

218.    As the Company's stock was actually worth only $42.15 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $79,988.10 for repurchases of its own stock between April 4, 2022 and May 1, 2022.

219.    According to the 2022 2Q 10-Q, between May 2, 2022 and May 29, 2022, the Company purchased 3,109 shares of its common stock for approximately $317,428.90 at an average price of $102.1 per share.

---

[5] Upon information and belief, these shares were repurchased during the Relevant Period.

220.    As the Company's stock was actually worth only $42.15 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $186,384.55 for repurchases of its own stock between May 2, 2022 to May 29, 2022.

221.    According to the 2022 2Q 10-Q, between May 30, 2022 and July 3, 2022, the Company purchased 2,562 shares of its common stock for approximately $248,257.80 at an average price of $96.90 per share.

222.    As the Company's stock was actually worth only $42.15 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $140,269.50 for repurchases of its stock between May 30, 2022 and July 3, 2022.

223.    According to the 2022 3Q 10-Q, between July 4, 2022 and July 31, 2022, the Company purchased 1,349 shares of its common stock for approximately $138,474.85 at an average price of $102.65 per share.

224.    As the Company's stock was actually worth only $42.15 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $81,614.50 for repurchases of its stock between July 4, 2022 and July 31, 2022.

225.    According to the 2022 3Q 10-Q, between August 1, 2022 and August 28, 2022, the Company purchased 228,207 shares of its common stock for approximately $19,477,467.45 at an average price of $85.35.

226.    As the Company's stock was actually worth only $42.15 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $9,858,542.40 for repurchases of its stock between August 1, 2022 and August 28, 2022.

227.    According to the 2022 3Q 10-Q, between August 29, 2022 and October 2, 2022, the Company purchased 730,256 shares of its common stock for approximately $87,264,690.56 at an average price of $116.76 per share.

228.    As the Company's stock was actually worth only $42.15 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $54,484,400.16 for the repurchases of its stock between August 29, 2022 and October 2, 2022.

229.    According to the 2021 10-K, between October 3, 2022, and October 30, 2022, the Company purchased 931 shares of its common stock for approximately $73,036.95 at an average price of $78.45 per share.

230.    As the Company's stock was actually worth only $42.15 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $33,795.30 for the repurchases of its stock between October 3, 2022 and October 30, 2022.

231.    According to the 2021 10-K, between October 31, 2022 and November 27, 2022, the Company purchased 4,632 shares of its common stock for approximately $408,681.36 at an average price of $88.23 per share.

232.     As the Company's stock was actually worth only $42.15 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $213,442.56 for the repurchases of its stock between October 31, 2022 and November 27, 2022.

233.    According to the 2021 10-K, between November 28, 2022 and January 1, 2023, the Company purchased 1,103 shares of its common stock for approximately $99,258.97 at an average price of $89.99 per share.

234.    As the Company's stock was actually worth only $42.15 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $52,767.52 for the repurchases of its stock between November 28, 2022 and January 1, 2023.

235.    According to the 2023 1Q 10-Q, between January 2, 2023 and January 29, 2023, the Company purchased 1,988 shares of its common stock for approximately $170,351.72 at an average price of $85.69 per share.

236.    As the Company's stock was actually worth only $42.15 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $86,557.52 for the repurchases of its stock between January 2, 2023 and January 29, 2023.

237.    According to the 2023 1Q 10-Q, between January 30, 2023 and February 26, 2023, the Company purchased 92,488 shares of its common stock for approximately $8,159,291.36 at an average price of $88.22 per share.

238.    As the Company's stock was actually worth only $42.15 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $4,260,922.16 for the repurchases of its stock between January 30, 2023 and February 26, 2023.

239.    According to the 2023 1Q 10-Q, between February 27, 2023 and April 2, 2023, the Company purchased 12,679 shares of its common stock for approximately $1,107,257.07 at an average price of $87.33 per share.

240.    As the Company's stock was actually worth only $42.15 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $572,837.22 for the repurchases of its stock between February 27, 2023 and April 2, 2023.

241.    According to the 2023 2Q 10-Q, between April 3, 2023 and April 30, 2023, the Company purchased 1,428 shares of its common stock for approximately $127,734.60 at an average price of $89.45 per share.

242.    As the Company's stock was actually worth on $42.15 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $67,544.40 for the repurchases of its stock between April 3, 2023 and April 30, 2023.

243.    According to the 2023 2Q 10-Q, between May 1, 2023, and May 28, 2023, the Company purchased 3,823 shares of its common stock for approximately $329,657.29 at an average price of $86.23 per share.

244.    As the Company's stock was actually worth on $42.15 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $168,517.84 for the repurchases of its stock between May 1, 2023 and May 28, 2023.

245.    According to the 2023 2Q 10-Q, between May 29, 2023 and July 2, 2023, the Company purchased 29,754 shares of its common stock for approximately $2,549,025.18 at an average price of $85.67 per share.

246.    As the Company's stock was actually worth on $42.15 per share, the price at closing April 2, 2024, the Company overpaid by approximately $1,294,894.08 for the repurchases of its stock between May 29, 2023 and July 2, 2023.

247.    According to the 2023 3Q 10-Q, between July 3, 2023, and July 30, 2023, the Company purchased 1,235 shares of its common stock for approximately $106,407.60 at an average price of $86.16 per share.

248.    As the Company's stock was actually worth $42.15 per share, the price at closing April 2, 2024, the Company overpaid by approximately $54,352.35 for repurchases of its stock between July 3, 2023 and July 30, 2023.

249.    According to the 2023 3Q 10-Q Form, between July 31, 2023, and August 27, 2023, the Company purchased 2,900 shares of its common stock for approximately $224,837 at an average price of $77.53.

250.    As the Company's stock was actually worth $42.15 per share, the price at closing April 2, 2024, the Company overpaid by approximately $102,602 for repurchases of its stock between July 31, 2023, and August 27, 2023.

251.    According to the 2023 3Q 10-Q, between August 28, 2023 and October 1, 2023, the Company purchased 2,785 shares of its common stock for approximately $211,214.40 at an average price of $75.84.

252.    As the Company's stock was actually worth $42.15 per share, the price at closing April 2, 2024, the Company overpaid by approximately $93,826.65 for repurchases of its stock between August 28, 2023 and October 1, 2023.

253.    According to the 2022 10-K, between October 2, 2023 and October 29, 2023, the Company purchased 3,674 shares of its common stock for approximately $244,835.36 at an average price of $66.64 per share.

254.    As the Company's stock was actually worth $42.15 per share, the price at closing April 2, 2024, the Company overpaid by approximately $89,976.26 for repurchases of its stock between October 2, 2023 and October 29, 2023.

255.    According to the 2022 10-K, between October 30, 2023 and November 26, 2023, the Company purchased 121,783 shares of its common stock for approximately $7,341,079.24 at an average of $60.28 per share.

256.    As the Company's stock was actually worth $42.15 per share, the price at closing April 2, 2024, the Company overpaid by approximately $2,207,925.79 for repurchases of its stock between October 30, 2023 and November 26, 2023.

257.    According to the 2022 10-K, between November 27, 2023, and December 31, 2023, the Company purchased 858 shares of its common stock for approximately $60,643.44 at an average of $70.68 per share.

258.    As the Company's stock was actually worth $42.15 per share, the price at closing April 2, 2024, the Company overpaid by approximately $24,478.74 for repurchases of its stock between November 27, 2023 and December 31, 2023.

259.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by *over $77.7 million*.

## DAMAGES TO QORTHO

260.    As a direct and proximate result of the Individual Defendants' conduct, QOrtho will lose and expend many millions of dollars.

261.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

262.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against

the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

263.    Such expenditures also include, but are not limited to, amounts paid to outside lawyers, accountants, and investigators in connection thereto, and losses of revenues caused by customers' loss of trust in the Company's business and products.

264.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

265.    Such losses include the Company's overpayment of $77.7 million for repurchases of its own stock during the period when the Company's stock price was artificially-inflated due to the false and misleading statements discussed herein.

266.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

267.    As a direct and proximate result of the Individual Defendants' conduct, QOrtho has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

268.    Plaintiff brings this action derivatively and for the benefit of QOrtho to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of QOrtho, unjust enrichment, gross mismanagement,

and violations of Section 14(a), 10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

269.    QOrtho is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

270.    Plaintiff is, and has been at all relevant times, a shareholder of QOrtho. Plaintiff will adequately and fairly represent the interests of QOrtho in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

271.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

272.    A pre-suit demand on the Board of QOrtho is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eleven individuals: Defendants Buechler, Dilsaver, Michael, Polan, Prutow, Rhoads, Schmidt, Strobeck, Widder, and Wilkins (the "Director-Defendants") and nonparty Brian J. Blaser. Plaintiff needs only to allege demand futility as to six of the eleven Directors who are on the Board at the time this action is commenced.

273.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

274.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted QOrtho in making and/or causing the Company to make materially false and misleading statements. Specifically, the Director-Defendants caused QOrtho to issue false and misleading statements which were intended to make QOrtho appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

275.    Additional reasons that demand on Defendant Buechler is futile follow.  Defendant Buechler has served as Chairman of the Board since December 2022 and has served as a Company director since 2007. He also serves as a member of the Nominating and Corporate Governance Committee and serves as Chair of the Science and Technology Committee. Defendant Buechler solicited the Merger Proxy Statement, which contained false and misleading statements and contributed to the election of Defendants Michael, Polan, Rhoads, Smith, Strobeck, Widder, Wilkins, Wise, and himself, which allowed them to continue to breach their fiduciary duties to the Company and caused the shareholders to approve the Incentive Plan Proposal that increased the amount of shares available under the Incentive Plan by 1,500,000, thereby providing Defendant Buechler with material personal benefits in the form of stock awards that he would not have otherwise received had the shareholders not approved the amendment to the Incentive Plan.[6]

---

[6] Before the shareholders approved the Incentive Plan Proposal at the special meeting of stockholders of Quidel on May 16, 2022, 1,350,265 shares remained available for future issuance under the Incentive Plan. After the shareholders approved the Incentive Plan Proposal, there were 2,850,265 shares available for issuance under the amended Incentive Plan. According to the 2024 Proxy Statement, as of December 31, 2023, only 1,265,845 shares were available under the amended Incentive Plan—disclosing that 1,584,420 shares were paid out to the officers and directors of the Company between the Merger and the end of Fiscal Year 2023, which was 234,155 shares more than the pre-vote remaining amount of 1,350,265 shares. For this reason, the Individual Defendants, including the Director-Defendants, received material person benefits that

Additionally, he solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants, Michael, Polan, Rhoads, Strobeck, Widder, Wilkins, and himself, and to the election of Defendants Dilsaver and Schmidt, which allowed them to continue to breach their fiduciary duties to the Company. Defendant Buechler has received and continues to receive handsome compensation for his role as a director described above. Defendant Buechler is eligible to receive stock awards under the Incentive Plan, has received various amounts of stock awards under the Incentive Plan, and will receive material amounts of stock awards under the Incentive Plan in the future, thereby materially benefiting from the adoption of the Incentive Plan.

276.    As the trusted Chairman of the Board, Defendant Buechler conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Furthermore, he engaged in lucrative insider trading, obtaining personal profits of approximately $729,366.  For these reasons, Defendant Buechler faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

277.    Additional reasons that demand on Defendant Dilsaver is futile follow. Defendant Dilsaver has served as a Company director since 2021. She also serves as a member of the Audit

---

they otherwise would not received, but for from the issuance of the false and misleading Merger Proxy Statement and the shareholders approving the amendment that increased the number of shares available under the Incentive Plan.

Committee. Defendant Dilsaver solicited the Merger Proxy Statement, which contained false and misleading statements and contributed to the election of Defendants Buechler, Michael, Polan, Rhoads, Smith, Strobeck, Widder, Wilkins, Wise, and herself, which allowed them to continue to breach their fiduciary duties to the Company and caused the shareholders to approve the Incentive Plan Proposal that increased the amount of shares available under the Incentive Plan by 1,500,000, thereby providing Defendant Dilsaver with material personal benefits in the form of stock awards that she would not have otherwise received had the shareholders not approved the amendment to the Incentive Plan. Additionally, Defendant Dilsaver solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Buechler, Micheal, Polan, Rhoads, Strobeck, Widder, and Wilkins, and the election of Defendant Schmidt and herself. Defendant Dilsaver has received and continues to receive handsome compensation for her role as a director described above.

278.    As a trusted Company director, Defendant Dilsaver conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Dilsaver faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

279.    Additional reasons that demand on Defendant Michael is futile follow. Defendant Michael has served as a director of the Company since 2018. He also serves as the Chair of the Compensation Committee and a member of the Science and Technology Committee. Defendant Michael solicited the Merger Proxy Statement, which contained false and misleading statements

and contributed to the election of Defendants Buechler, Polan, Rhoads, Smith, Strobeck, Widder, Wilkins, Wise and himself, which allowed them to continue to make false and misleading statements and caused the shareholders to approve the Incentive Plan Proposal that increased the amount of shares available under the Incentive Plan by 1,500,000, thereby providing Defendant Michael with material personal benefits in the form of stock awards that he would not have otherwise received had the shareholders not approved the amendment to the Incentive Plan.. Additionally, he solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants, Buechler, Polan, Rhoads, Strobeck, Widder, Wilkins and himself, and to the election of Defendants Dilsaver and Schmidt, which allowed them to continue to make false and misleading statements. Defendant Michael has received and continues to receive handsome compensation for his role as a director described above. As a trusted Company director, Defendant Michael conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Michael faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

280.    Additional reasons that demand on Defendant Polan is futile to follow. Defendant Polan has served as a director of the Company since 1993. She also serves as a member of both the Compensation Committee and the Science and Technology Committee. Defendant Polan solicited the Merger Proxy Statement, which contained false and misleading statements and

contributed to the election of Defendants Buechler, Michael, Rhoads, Smith, Strobeck, Widder, Wilkins, Wise and herself, which allowed them to continue to make false and misleading statements and caused the shareholders to approve the Incentive Plan Proposal that increased the amount of shares available under the Incentive Plan by 1,500,000, thereby providing Defendant Polan with material personal benefits in the form of stock awards that she would not have otherwise received had the shareholders not approved the amendment to the Incentive Plan. Additionally, she solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants, Buechler, Michael, Rhoads, Strobeck, Widder, Wilkins and herself, and to the election of Defendants Dilsaver and Schmidt, which allowed them to continue to make false and misleading statements. Defendant Polan has received and continues to receive handsome compensation for her role as a director described above. As a trusted Company director, Defendant Polan conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. Furthermore, she engaged in lucrative insider trading, obtaining personal profits of approximately $173,227. For these reasons, Defendant Polan faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

281.    Additional reasons that demand, Defendant Prutow has served as a director of the Company since November 28, 2023. He also serves as a member of the Nominating and Corporate Governance Committee and as a member of the Science and Technology Committee. Defendant

Prutow has received and continues to receive handsome compensation for his role as a director described above, and as such, receives material personal benefits in the form of stock awards that she would not have otherwise received had the shareholders not approved the amendment to the Incentive Plan. As a trusted Company director, Defendant Prutow conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Prutow faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

282.    Additional reasons that demand on Defendant Rhoads is futile follow.  Defendant Rhoads has served as a director of the Company since 2020. She also serves as the Chair of the Audit Committee. Defendant Rhoads solicited the Merger Proxy Statement, which contained false and misleading statements and contributed to the election of Defendants Buechler, Michael, Polan, Smith, Strobeck, Widder, Wilkins, Wise, and herself, which allowed them to continue to make false and misleading statements and caused the shareholders to approve the Incentive Plan Proposal that increased the amount of shares available under the Incentive Plan by 1,500,000, thereby providing Defendant Rhoads with material personal benefits in the form of stock awards that she would not have otherwise received had the shareholders not approved the amendment to the Incentive Plan. Additionally, she solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Buechler, Michael, Polan, Strobeck, Widder, Wilkins and herself, and to the election of Defendants Dilsaver and

Schmidt, which allowed them to continue to make false and misleading statements. Defendant Rhoads has received and continues to receive handsome compensation for her role as a director described above. As a trusted Company director, Defendant Rhoads conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Rhoads faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

283.    Additional reasons that demand on Defendant Schmidt is futile follow. Defendant Schmidt has served as a director of the Company since 2022. He also serves as a member of the Compensation Committee. Defendant Schmidt solicited the Merger Proxy Statement, which contained false and misleading statements and contributed to the election of Defendants Buechler, Michael, Polan, Smith, Strobeck, Widder, Wilkins, Wise, and himself, which allowed them to continue to make false and misleading statements and caused the shareholders to approve the Incentive Plan Proposal that increased the amount of shares available under the Incentive Plan by 1,500,000, thereby providing Defendant Schmidt with material personal benefits in the form of stock awards that he would not have otherwise received had the shareholders not approved the amendment to the Incentive Plan. Defendant Schmidt solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Buechler, Micheal, Polan, Rhoads, Strobeck, Widder, and Wilkins, and the election of Defendant Dilsaver and himself. Defendant Schmidt has received and continues to receive handsome

compensation for his role as a director described above. As a trusted Company director, Defendant Schmidt conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded him duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Schmidt faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

284.    Additional reasons that demand on Defendant Strobeck is futile follow. Defendant Strobeck has served as a director of the Company since 2018. He also serves as a member of the Audit Committee and as a member of the Science and Technology Committee. Defendant Strobeck solicited the Merger Proxy Statement, which contained false and misleading statements and contributed to the election of Defendants Buechler, Michael, Polan, Rhoads, Smith, Widder, Wilkins, Wise, and himself, which allowed them to continue to make false and misleading statements and caused the shareholders to approve the Incentive Plan Proposal that increased the amount of shares available under the Incentive Plan by 1,500,000, thereby providing Defendant Strobeck with material personal benefits in the form of stock awards that he would not have otherwise received had the shareholders not approved the amendment to the Incentive Plan. Additionally, he solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Buechler, Michael, Polan, Rhoads, Widder, Wilkins and himself, and to the election of Defendants Dilsaver and Schmidt, which allowed them to continue to make false and misleading statements. Defendant Strobeck has received and continues to receive handsome compensation for his role as a director described

above. As a trusted Company director, Defendant Strobeck conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Strobeck faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

285.    Additional reasons that demand on Defendant Widder is futile follow.  Defendant Widder has served as a director of the Company since 2014. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of both the Audit Committee and the Science and Technology Committee. Defendant Widder solicited the Merger Proxy Statement, which contained false and misleading statements and contributed to the election of Defendants Buechler, Michael, Polan, Rhoads, Smith, Strobeck, Wilkins, Wise, and himself, which allowed them to continue to make false and misleading statements and caused the shareholders to approve the Incentive Plan Proposal that increased the amount of shares available under the Incentive Plan by 1,500,000, thereby providing Defendant Widder with material personal benefits in the form of stock awards that he would not have otherwise received had the shareholders not approved the amendment to the Incentive Plan. Additionally, he solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Buechler, Michael, Polan, Rhoads, Strobeck, Wilkins, and himself, and to the election of Defendants Dilsaver and Schmidt, which allowed them to continue to make false and misleading statements. Defendant Widder has received and continues to receive

handsome compensation for his role as a director described above. As a trusted Company director, Defendant Widder conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Widder faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

286.    Additional reasons that demand on Defendant Wilkins is futile follow.  Defendant Wilkins has served as a director of the Company since 2021. He also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Wilkins solicited the Merger Proxy Statement, which contained false and misleading statements and contributed to the election of Defendants Buechler, Michael, Polan, Rhoads, Smith, Strobeck, Widder, Wise, and himself, which allowed them to continue to make false and misleading statements and caused the shareholders to approve the Incentive Plan Proposal that increased the amount of shares available under the Incentive Plan by 1,500,000, thereby providing Defendant Wilkins with material personal benefits in the form of stock awards that he would not have otherwise received had the shareholders not approved the amendment to the Incentive Plan. Additionally, he solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Buechler, Michael, Polan, Rhoads, Strobeck, Widder, and himself, and to the election of Defendants Dilsaver and Schmidt, which allowed them to continue to make false and misleading statements. Defendant

Wilkins has received and continues to receive handsome compensation for his role as a director described above. As a trusted Company director, Defendant Wilkins conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Wilkins faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

287.    Additional reasons that demand on the Board is futile follow.

288.    Each of the Director-Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by ***approximately $77.7 million*** for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

289.    Defendants Rhoads (as Chair), Dilsaver, and Strobeck (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. The Audit Committee Defendants violated the Audit Committee Charter by engaging in or permitting the scheme to cause the Company to making false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In addition, the Audit

Committee Defendants violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

290.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the schemes to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In addition, the Individual Defendants violated the Codes of Conduct by failing to act with integrity, supporting and profiting from unethical behavior, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Codes of Conduct, are not disinterested, and demand is excused as to them.

291.    QOrtho has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for QOrtho any part of the damages QOrtho suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

292.    The acts complained of herein constitute violations of fiduciary duties owed by QOrtho's officers and directors, and these acts are incapable of ratification.

293.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

294.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of QOrtho. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of QOrtho, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

295.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause QOrtho to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

296.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Directors cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

<u>**FIRST CLAIM**</u>
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

297.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

298.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

299.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

300.    Under the direction and watch of Defendants Buechler, Michael, Polan, Rhoads, Smith, Strobeck, Widder, Wilkins and Wise, the Merger Proxy Statement failed to disclose: (1) through the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the Merger Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

301.    The Merger Proxy Statement failed to disclose that: (1) QOrtho oversold COVID-19 tests to pharmacy chains and distributors in excess of what the clients could resell to end customers and healthcare providers; (2) as a result, the supply chain was saturated because pharmacy chains and distributors held excess inventory of COVID-19 tests; (3) as a further result, distributors and pharmacy chains significantly lowered their COVID-19 test orders from QOrtho; (4) undisclosed issues with the Savanna would delay the Savanna's entry into the U.S. market; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the amendment increasing the number of shares available under the Incentive Plan; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

302.    In exercise of reasonable care, Defendants Buechler, Michael, Polan, Rhoads, Smith, Strobeck, Widder, Wilkins and Wise, should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Merger Proxy Statement were materially false and misleading. The misrepresentations and omissions were

material to Plaintiff in voting on matters set forth shareholder determination in the Merger Proxy Statement, including but not limited to the re-election of Defendant Buechler, Michael, Polan, Rhoads, Smith, Strobeck, Widder, Wilkins, and Wise and the approval of the Incentive Plan Proposal.

303.    The Company was damaged as a result of Defendants Buechler, Michael, Polan, Rhoads, Smith, Strobeck, Widder, Wilkins and Wise, material misrepresentations and omissions in the Merger Proxy Statement.

304.    Under the direction and watch of Defendants Buechler, Dilsaver, Michael, Polan Rhoads, Schmidt, Strobeck, Widder and Wilkins, the 2023 Proxy Statement failed to disclose: (1) through the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

305.    The 2023 Proxy Statement failed to disclose that: (1) QOrtho oversold COVID-19 tests to pharmacy chains and distributors in excess of what the clients could resell to end customers and healthcare providers; (2) as a result, the supply chain was saturated because pharmacy chains and distributors held excess inventory of COVID-19 tests; (3) as a further result, distributors and pharmacy chains significantly lowered their COVID-19 test orders from QOrtho; (4) undisclosed issues with the Savanna would delay the Savanna's entry into the U.S. market; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the amendment increasing the number of shares available

under the Incentive Plan; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

306.    In the exercise of reasonable case, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to the re-election of to the re-election of Defendants Buechler, Michael, Polan, Rhoads, Strobeck, Widder, and Wilkins, and to the election of Defendants Dilsaver and Schmidt.

307.    The Company was damaged as a result of Defendants Buechler, Michael, Polan, Rhoads, Strobeck, Widder, and Wilkins, material misrepresentations and omissions in the 2023 Proxy Statement.

308.    Plaintiff, on behalf of QOrtho, has no adequate remedy at law.

### SECOND CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934**

309.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

310.    The Individual Defendants, by virtue of their positions with QOrtho and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of QOrtho and each of its officers and directors who made false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and

influence and exercised the same to cause QOrtho to engage in the illegal conduct and practices complained of herein.

311.    Plaintiff, on behalf of QOrtho, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the**
**Securities Exchange Act of 1934**

312.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

313.    The Individual Defendants participated in a scheme to defraud with purpose and effect of defrauding QOrtho. Not only is QOrtho now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon QOrtho by the Individual Defendants caused by the Company to repurchase more than *$77.7 million* of its own shares at artificially inflated prices, damaging QOrtho.

314.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about QOrtho not misleading.

315.    The Individual Defendants, as top executives and directors of the Company are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and directors of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by QOrtho.

316.     The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

317.     By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

318.     Plaintiff, on behalf of QOrtho, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

319.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

320.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of QOrtho's business and affairs.

321.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

322.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of QOrtho.

323.     In breach of their fiduciary duties owed to QOrtho, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements

and omissions of material fact that failed to disclose, *inter alia*, that: (1) QOrtho oversold COVID-19 tests to pharmacy chains and distributors in excess of what the clients could resell to end customers and healthcare providers; (2) as a result, the supply chain was saturated because pharmacy chains and distributors held excess inventory of COVID-19 tests; (3) as a further result, distributors and pharmacy chains significantly lowered their COVID-19 test orders from QOrtho; (4) undisclosed issues with the Savanna would delay the Savanna's entry into the U.S. market; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the amendment increasing the number of shares available under the Incentive Plan; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

324.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

325.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

326.    In yet further breach of fiduciary duties, during the Relevant Period, Defendants Buechler and Polan engaged in insider sales, netting collective proceeds of approximately $902,616, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

327.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct

the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

328.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

329.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, QOrtho has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

330.    Plaintiff, on behalf of QOrtho, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Unjust Enrichment**

331.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

332.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, QOrtho.

333.    The Individual Defendants either benefitted financially from the improper conduct and their making insider sales, or received profits, bonuses, stock options, or similar compensation from QOrtho that was tied to the performance or artificially inflated valuation of QOrtho, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

334.     Plaintiff, as a shareholder and representative of QOrtho, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

335.     Plaintiff, on behalf of QOrtho, has no adequate remedy at law.

## FOURTH CLAIM
### Against Individual Defendants for Abuse of Control

336.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

337.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence QOrtho, for which they are legally responsible.

338.     As a direct and proximate result of the Individual Defendants' abuse of control, QOrtho has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

339.     Plaintiff, on behalf of QOrtho, has no adequate remedy at law.

## FIFTH CLAIM
### Against Individual Defendants for Gross Mismanagement

340.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

341.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of QOrtho in a manner consistent with the operations of a publicly held corporation.

342.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, QOrtho has sustained and will continue to sustain significant damages.

343.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

344.    Plaintiff, on behalf of QOrtho, has no adequate remedy at law.

**SIXTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

345.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

346.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

347.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

348.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

349.    Plaintiff, on behalf of QOrtho, has no adequate remedy at law.

**SEVENTH CLAIM**
**Against Defendants for Bryant, Busky, and Steward Contribution Under Sections 10(b) and 21D of the Exchange Act**

350.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

351.    QOrtho and Defendants Bryant, Busky, and Steward are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Bryant, Busky, and Steward's willful and/or reckless violations of their obligations as officers and/or directors of QOrtho.

352.    Defendants Bryant, Busky, and Steward, because of their positions of control and authority as officers and/or directors of QOrtho, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of QOrtho, including the wrongful acts complained of herein and in the Securities Class Action.

353.    Accordingly, Defendants Bryant, Busky, and Steward are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

354.    As such, QOrtho is entitled to receive all appropriate contribution or indemnification from Defendants Byrant, Busky, and Steward.

**<u>PRAYER FOR RELIEF</u>**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of QOrtho, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to QOrtho;

(c)      Determining and awarding to QOrtho the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)      Directing QOrtho and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect QOrtho and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

      2. a provision to permit the shareholders of QOrtho to nominate at least four candidates for election to the Board; and

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding QOrtho restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Date: June 21, 2024

Respectfully Submitted,

**THE BROWN LAW FIRM P.C.**

*/s/ Timothy Brown*
Timothy Brown
Saadia Hashmi
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
        shashmi@thebrownlawfirm.net

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

      I, Steven Pinkney, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

      I declare under penalty of perjury that the foregoing is true and correct.  Executed this 17th day of June, 2024.

DocuSigned by:

*Steven Pinkney*

6E77D3F3979142A

Steven Pinkney